**Patricia S. MIKES and Patricia S. Mikes, Individually, Plaintiffs,**

v.

**Marc STRAUSS, Jeffrey M. Ambinder and Eliot L. Friedman, Defendants.**

No. 92 Civ. 2754 (WCC).

United States District Court, S.D. New York.

June 20, 1995.

Holland Kaufmann & Bartels (Harold R. Burke, of counsel), Greenwich, CT, for plaintiffs.

Meiselman, Farber, Packman & Eberz, P.C. (Mary Beth Kilgannon, of counsel), Mount Kisco, NY, for defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

Patricia Mikes brings this action on behalf of the United States and herself against her former employers under the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3730, for alleged improper billing of medical procedures to the United States and for retaliatory discharge, and under New York Labor Law § 191, for unpaid wages for a two-week period of employment after her formal termination. In May, 1994 the Court granted defendants' motion to dismiss the complaint, in part for failing to state a claim in light of the fraud pleading requirement of Rule 9(b), Fed.R.Civ.Pro., *see United States ex rel. Mikes v. Straus*, 853 F.Supp. 115 (S.D.N.Y.1994) [hereinafter *Mikes I* ], but allowed plaintiff to replead her charges to overcome the noted infirmities of the complaint. After plaintiff filed a First Amended Complaint, defendant again moved to dismiss the action under Rules 12(b)(6) and 9(b) or, in the alternative, to compel arbitration. Converting defendants' motion *sua sponte* into a motion for summary judgment, the Court reserved decision pending submission by plaintiff of more detailed affidavits to substantiate the allegations of the First Amended Complaint. In accordance with that order, plaintiff has submitted her own affidavit and, in addition, has moved for a continuance under Rule 56(f), Fed.R.Civ.Pro., to allow further discovery prior to our disposition of the court-converted summary judgment motion. Because we find that the First Amended Complaint and plaintiff's affidavit raise genuine issues of fact for trial on plaintiff's *qui tam* and retaliatory discharge claims, we see no reason to delay this disposition any longer. Therefore, plaintiff's motion for a continuance and defendants' converted motion for summary judgment are both denied. Defendants' motion to compel arbitration is granted in part and denied in

part as outlined below. Defendants' motion for a stay pending arbitration is denied.

## I.

In May, 1991 plaintiff entered into an employment agreement (the "Agreement") with defendants, doing business as Oxford Medical, Oxford Hematology Associates, and Pulmonary and Critical Care Associates ("PCCA"), to provide pulmonary care to individuals in hospitals located in Westchester and Putnam counties in New York. Plaintiff claims that while she was employed by defendants, defendants regularly misused spirometry and magnetic resonance imaging ("MRI")[1] tests to overcharge patients, many of which were Medicare recipients, for medical services.

Specifically, plaintiff claims, without citing a specific instance, that over the course of her employment she observed spirometry tests performed incorrectly, performed with uncalibrated instruments, repeatedly administered to patients when unnecessary, and often administered without subsequent interpretation of the test results. Likewise, plaintiff claims that defendants utilized MRIs to the exclusion of often more probative and less expensive x-ray or CT scans, administered MRIs excessively and unnecessarily, and often obtained MRIs of parts of patients' bodies unrelated to the diagnosis and treatment of their ailments. Referring to one instance when an x-ray she ordered revealed a patient's tumor, plaintiff notes that MRIs ordered by defendants, the last as recently as one month prior to her examination, had failed to discover the tumor.

Plaintiff also claims that defendants performed their MRI examinations at facilities operated by Intercounty MRI Imaging of Yonkers ("Intercounty") and Tri–County Mobil MRI Imaging ("Tri–County") primarily because Tri–County, a mobile MRI unit founded in part by defendants Straus and Ambinder, paid those defendants a $60,000/

---

1. Spirometry is a diagnostic technique that utilizes a spirometer to measure air flow as indicative of lung function. MRI tests, like x-ray or coaxial tomography ("CT") scans, permit nonintrusive viewing of internal organs, bones, and systems. However, unlike x-rays which rely on differences in radiation absorption to view internal body features, a somewhat ineffective means of highlighting soft tissues, MRI evaluates differences in the spin magnetic moments of subatomic particles which vary based on a substance's chemical composition and can be very useful in mapping soft tissue features.

year consulting fee and Intercounty paid defendant Friedman for referring patients to it.

In September, 1991 plaintiff approached defendant Straus and informed him of the misuse of spirometry testing. Around the same time, plaintiff also presented an article to the defendants on the drawbacks of MRI testing of the respiratory system. Plaintiff claims that defendants treated her complaints with indifference and continued their improper use of spirometry and MRI tests. Subsequently, on December 16, 1991, plaintiff received written notice of the termination of her employment agreement. Although the notice cited her failure to maintain admitting privileges at Peekskill Hospital as required in the Agreement as the reason for her discharge, plaintiff claims that the discharge was in response to her complaints about defendants' improper testing and fraudulent billing practices.

In 1992, plaintiff filed suit claiming that defendants are liable under the FCA, 31 U.S.C. § 3729, for submitting claims to the United States through the Medicare program for unwarranted and improperly administered spirometry and MRI tests, under 31 U.S.C. § 3730(h) and New York Labor Law § 740 for retaliatory discharge, and under New York Labor Law § 191 for unpaid wages for work that she performed after defendants terminated the Agreement. Defendants moved to dismiss for, among other things, failing to state a claim on which relief could be granted under Rule 12(b)(6), Fed. R.Civ.Pro., and for failing to meet the heightened pleading requirements for claims based on fraud under Rule 9(b), Fed.R.Civ.Pro. Judge Broderick granted defendants' motion, but also granted plaintiff leave to amend her complaint to comply with Rule 9(b)'s requirements. *Mikes I*, 853 F.Supp. at 117.

Plaintiff then filed a First Amended Complaint further detailing the defendants' fraudulent practices. That complaint, containing five claims for relief, charged defendants with knowingly presenting false claims to the government in violation of 31 U.S.C. § 3729(a)(1), using false records to facilitate payment of a fraudulent claim in violation of 31 U.S.C. § 3729(a)(2), conspiring to defraud the Government in violation of 31 U.S.C. § 3729(a)(3), discharging plaintiff in retaliation for preparing to file this action in violation of 31 U.S.C. § 3730(h), and failing to pay plaintiff wages for the two-week period that she worked after her termination in violation of New York Labor Law § 191(3).

Defendants again moved to dismiss the action under Rules 12(b)(6) and 9(b). In addition, they renewed a previously undisposed motion to compel arbitration of all of plaintiff's claims pursuant to § 15 of her employment contract and to stay any remaining district court action pending arbitration. Without ruling on any of defendants' motions, Judge Broderick converted the motion to dismiss into a summary judgment motion and instructed plaintiff to provide sufficient proof, without conducting discovery, to demonstrate the existence of a genuine issue of fact for trial. Plaintiff then filed her own affidavit, mirroring the claims outlined in the First Amended Complaint, and requested a continuance of the court-converted motion to conduct extensive discovery. That motion for a continuance, along with defendants' response, the court-converted summary judgment motion, and defendants' motion to compel arbitration and stay district court action pending arbitration are before us now.

## II.

■ The *qui tam* provisions of the FCA, *see generally* 31 U.S.C. §§ 3730(b)–(g), which have existed in various incarnations since 1863, empower private plaintiffs, known as relators,[2] to bring suits on behalf of the government against persons who knowingly present false or fraudulent claims to the government for approval or payment in violation of 31 U.S.C. § 3729.[3] *United States ex rel.*

---

**2.** Because Ms. Mikes stands as both a relator and a plaintiff in this suit, for consistency we refer to her as only the plaintiff throughout this opinion.

**3.** *Qui tam* is an adaptation of the longer phrase *qui tam pro domino rege quam pro seipo,* which literally means "he who as much for the king as

for himself." This method of prosecution first gained popularity in thirteenth-century England as a method of supplementing ineffective law enforcement. *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 647 n. 1 (D.C.Cir.1994).

*S. Prawer & Co. v. Fleet Bank of Maine,* 24 F.3d 320, 324 (1st Cir.1994). Initially designed to encourage citizens to ferret out fraud on the federal government, the statute has been repeatedly amended in light of perceived abuses by relators who have used its provisions as a windfall.[4] In 1986, however, concerned with sophisticated and widespread fraud depleting the national fisc, Congress expanded the statute's reach somewhat by broadly defining previously undefined terms and increasing the penalties associated with liability. *See* S.Rep. No. 345, 99th Cong., 2d Sess. 1–2 (1986) [hereinafter S.Rep. No. 345], *reprinted in* 1986 U.S.C.C.A.N. 5266, 5266–67. Specifically, Congress added § 3729(b) which defined "knowing" and "knowingly" as having actual knowledge of the false or fraudulent information, having deliberate ignorance of the truth or falsity of the information, or acting in reckless disregard of the truth or falsity of the information. Moreover, Congress made clear that plaintiffs need not allege or prove a defendant's specific intent to defraud to recover under the statute. 31 U.S.C. § 3729(b).

▮ Against the backdrop of this most recent amendment, plaintiff predicates her *qui tam* action on three liability theories: 1) that defendants knowingly presented, or caused to be presented, to the government a false or fraudulent claim for payment; 2) that defendants knowingly made, used, or caused to be used, false records or statements to obtain payment on a false or fraudulent claim; and 3) that defendants conspired to defraud the government. *See* 31 U.S.C. § 3729(a)(1)–(3). Therefore, to overcome defendants' motion for summary judgment, plaintiff must supply sufficient evidence from which a reasonable jury could conclude that 1) defendants made a claim for payment from the government, and 2) that claim was false or fraudulent. *United States ex rel. Glass v. Medtronic, Inc.,* 957 F.2d 605, 608 (8th Cir. 1992); *United States v. Bouchey,* 860

F.Supp. 890, 893 (D.D.C.1994). In addition, to maintain her conspiracy claim, plaintiff must supply sufficient evidence to establish 1) that defendants conspired with one or more persons to have a fraudulent claim paid by the United States, 2) that one or more of the conspirators performed any act to have such a claim paid by the United States, and 3) that the United States suffered damages as a result of the claim. *Id.* Having examined plaintiff's affidavit filed in opposition to this motion, and in light of our duty to draw all reasonable inferences in favor of the nonmoving party, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14, 91 L.Ed.2d 202 (1986), we hold that plaintiff has met her *prima facie* burden under each of her liability theories.

▮ At the outset, we must emphasize the procedural posture of this case and Judge Broderick's reasoning for converting defendants' motion from a motion to dismiss into a motion for summary judgment. Attempting to balance the need to root out fraud practiced on the government with the chilling effect that suits such as this may have on "the willingness of qualified personnel to undertake the difficult work required," the Court ordered plaintiff to substantiate her charges through evidence then available to her before allowing the suit to proceed. *Mikes,* 853 F.Supp. at 118. On the other hand, the Court never expected plaintiff to be able to detail every aspect of defendants' alleged fraudulent scheme prior to conducting any discovery. Instead, the primary concern of the Court was to prevent plaintiff from conducting a fishing expedition through the intricacies of defendants' business in the hopes of uncovering some unlawful conduct on which to base the instant action. While plaintiff's affidavit does not far exceed the "scintilla of evidence" required to defeat a motion for summary judgment, we think it is sufficient, in light of the procedural posture of this case, to overcome defendants' motion.[5]

---

**4.** For a more complete history of the FCA's *qui tam* provisions, *see Springfield Terminal,* 14 F.3d at 649–51.

**5.** Our result would not change were we to decide this motion under Rules 12(b)(6) and 9(b), Fed. R.Civ.Pro., as initially presented to the Court.

Plaintiff's complaint sufficiently alleges a cause of action under § 3729 and details the who, what, when, where, and how of defendants' fraudulent scheme mandated by the enhanced pleading requirement of Rule 9(b). *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 557–58 (2d Cir. 1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175,

In her affidavit, plaintiff outlines defendants' overuse and misuse of spirometry and MRI tests. She asserts that many of the patients on which these procedures were performed participated in Medicare, and that either those patients or defendants, through the businesses that they owned, presented claims to Medicare based on those unwarranted tests. In addition, she claims that defendants, joint partners in Oxford, Oxford Hematology Associates, and PCCA, each overbilled the government, each ignored plaintiff's criticisms of their policies, and ultimately decided to fire plaintiff for her whistleblowing. These allegations are sufficient to demonstrate the existence of genuine issues of material fact regarding whether defendants made claims for payment to the government, whether these claims were false or fraudulent, and whether defendants conspired in their efforts to defraud the government. While plaintiff has not at this time supplied documentary proof that these events occurred, we think her affidavit is sufficient to satisfy the Court's concerns articulated above.

### III.

Plaintiff also brings a claim for retaliatory discharge under 31 U.S.C. § 3730(h). That statutes provides:

Any employee who is discharged ... by his or her employer because of lawful acts done by the employee on behalf of the employee and others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

Plaintiff alleges that she was discharged because she challenged defendants' testing methods. Although she did not file this law suit until well after her discharge, she claims that her discharge was in retaliation for her investigation of defendants' unlawful billing practices in preparation for filing this § 3730 action.

Defendants counter that because there existed multiple appropriate reasons for her termination, plaintiff cannot establish that she was terminated in retaliation for investigating a potential *qui tam* claim. In his affidavit, defendant Straus claims that plaintiff was discharged for, among other things, failing to obtain admitting privileges at Peekskill Hospital and receiving only 12 referrals from the hospitals from which she had obtained privileges in the six months after she was employed by defendants. Moreover, defendants contend that since plaintiff was on probation at the time she was fired, she could be fired for any reason at all.

■ To sustain an action under § 3730(h), plaintiff must prove 1) that she engaged in conduct protected under the statute, 2) that defendants were aware of her conduct, and 3) that she was terminated in retaliation for her conduct. *See Robertson v. Bell Helicopter Textron Inc.*, 32 F.3d 948, 951 (5th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1110, 130 L.Ed.2d 1075 (1995).

■ As to the first requirement, plaintiff need not have actually filed suit under the FCA to receive the protection accorded by § 3730(h). *Clemes v. Del Norte County Unified Sch. Dist.*, 843 F.Supp. 583, 595 (N.D.Cal.1994); *United States ex rel. Kent v. Aiello*, 836 F.Supp. 720, 723–24 (E.D.Cal. 1993). We feel that plaintiff has established that she engaged in protected conduct by observing the misuse of spirometry tests, investigating the medical histories of patients she treated indicating that spirometry and MRI tests were overutilized, and confronting defendants with her observations. Taking these allegations as true, evidence that the defendants fraudulently billed these tests would form a reasonable basis for bringing a *qui tam* action under the FCA. *Neal v. Honeywell Inc.*, 33 F.3d 860, 864 (7th Cir. 1994); *Wilkins*, at 1065. Therefore, her ob-

64 L.Ed.2d 802 (1980). Although plaintiff does not detail every specific instance when defendants' alleged overbilling occurred, we think the allegations of spirometry and MRI misuse are sufficiently specific to put defendants on notice of their alleged fraudulent activity under circumstances of a *qui tam* action. *See Wilkins ex rel. United States v. Ohio*, 885 F.Supp. 1055, 1060–61 (S.D.Ohio 1995) (applying exception to Rule 9(b)'s particularity requirement when facts lie exclusively within the knowledge and control of the moving party).

servations and her confrontations with defendants fall within § 3730(h)'s protective umbrella. *See* S.Rep. No. 345, at 34, *reprinted in* 1986 U.S.C.C.A.N. at 5299 ("Protected activity should ... be interpreted broadly.").

As to the second element—defendant's knowledge—the Second Circuit has yet to interpret that aspect of § 3730(h). However, the Fifth Circuit, seizing on the legislative history of the statute indicating that a "whistleblower must show the employer had knowledge the employee engaged in 'protected activity,'" S.Rep. No. 345, at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300, has held that absent evidence indicating that the employee actually accused the company of defrauding the government prior to his termination, the employee cannot establish that the employer had knowledge that he was engaged in protected activity. *Robertson*, 32 F.3d at 951. In that case, the plaintiff, Robertson, complained to his supervisors about unsubstantiated maintenance and repair costs that he had been directed to charge to the government under the Army Helicopter Improvement Program. The court held that despite the fact that Robertson's supervisors were aware of his concerns, because Robinson had neither specifically charged the company with "illegal" activity nor alluded to potential *qui tam* liability, as a matter of law there was insufficient evidence that the defendant knew that his investigation was "in furtherance of a *qui tam* action." *Id.*

■ To the extent that *Robertson* might be construed as establishing a bright line rule that, to sustain an action under § 3730(h), before termination the employee must expressly accuse the employer of defrauding the government or threaten a *qui tam* action based thereon, we decline to follow the Fifth Circuit's lead. *See id.* However, we think that *Robertson* more broadly interpreted states the correct notice rule: that to overcome a motion for judgment as a matter of law (or summary judgment), an employee must supply sufficient facts from which a reasonable jury could conclude that the employee was discharged because of activities which gave the employer reason to believe that the employee was contemplating a *qui tam* action against it. To insist upon

an express or even an implied threat of such action would impose a requirement which is wholly unrealistic in an employment context. Despite the protection afforded by § 3730(h)—of which most employees are doubtless unaware—those who tell their employers they are preparing to sue them on behalf of a defrauded government can scarcely expect a long and happy tenure.

The *Robertson* court found that since Robertson's job required that he substantiate his firm's charges to the government, questioning his supervisors about those charges under the circumstances would not have led his employer to believe he was laying the groundwork for a legal action against it. *Id.; see Wilkins*, at 1066. The circumstances in the instant case are different, however.

■ Plaintiff alleges that on September 15, 1991 she complained to Straus about the misuse of spirometry tests and specifically informed him that the failure to provide written interpretation of the tests precluded his charging them to Medicare. Later, in a mid-October, 1991 meeting, she complained to Straus about the overuse of MRI tests. Although these discussions stop short of a specific accusation of fraud, they clearly imply that defendant's activities were unlawful. Drawing all reasonable inferences in favor of plaintiff, a jury could conclude that defendants knew plaintiff had uncovered their misuse of tests and fraudulent billing therefor.

In addition, plaintiff inspected Straus' so called "private" files, informed him of that fact, and accused him of overutilizing MRI tests. Following on the heels of her earlier accusations implying Medicare overbilling, these charges could confirm the defendants' earlier suspicions regarding plaintiff's activities, and heighten the motivation to terminate her employment. Moreover, Straus' alleged enraged reaction to plaintiff's unauthorized inspections lends credence to this theory. While defendants contest plaintiff's recounting of these events, we are not in a position to weigh the facts on this motion. In light of the totality of the circumstances surrounding plaintiff's activities, we find that a reasonable jury could conclude that defendants had reason to believe that plaintiff was investigating their alleged fraudulent billing

practices in contemplation of a possible *qui tam* action.

■■■ Regarding the third § 3730(h) element, that defendants terminated plaintiff *because of* her investigatory activities, defendants strongly urge that because so many valid reasons existed for firing her, plaintiff has not established that her termination was in any way related to her investigation. They also argue that because she was on probation at the time of her termination, she could be fired for any reason.[6] While we agree that defendants could have terminated plaintiff for any *lawful* reason, plaintiff has raised an issue of fact regarding the actual reason in this case. Once plaintiff has done so, the burden shifts to defendants to prove affirmatively by a preponderance of the evidence that the same decision would have been made even if plaintiff had not engaged in protected activity. *Cf. Consolidated Edison of New York, Inc. v. Donovan,* 673 F.2d 61, 62 (2d Cir.1982) (applying burden shifting in retaliatory discharge context); *Mt. Healthy City Sch. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); S.Rep. No. 345 at 35, *reprinted in* 1986 U.S.C.C.A.N. at 5300. Plaintiff alleges that subsequent to her confrontations, she was "increasingly alienated by the defendants, not invited to meetings at which patients were discussed, [and] subjected to hostile remarks and harassing behavior by Straus privately and at meetings in which the other defendants were present." Plaintiff's Affidavit at ¶ 26. Moreover, although when she was fired plaintiff had not yet obtained admitting privileges at Peekskill Hospital as required by the Agreement, her application for such privileges was still being considered by the Peekskill Medical Board and she had obtained privileges at all of the principal hospitals relevant to her medical practice with defendants. Since plaintiff has called into question defendants' stated reason, and her affidavit raises a triable fact issue whether her investigation played a primary role in her termination, we cannot grant summary disposition.

## IV.

Prior to the Court's conversion of defendants' motion to dismiss into one for summary judgment, defendant requested arbitration of any claims not dismissed by the Court. Judge Broderick reserved that issue pending plaintiff's submission now before the Court. Having denied defendants' converted motion for summary judgment, we must now address the arbitrability of plaintiff's claims.

> Section fifteen of the Agreement provides: The parties agree to do their best to work out ways and means, in good faith, by frank and fair discussion between them, to amicably settle any disagreements, claims, questions or controversies which may arise out of or relate to this Agreement or out of its interpretation or any alleged breach thereof. In case of failure to reach accord by any such direct ways and means, disputes shall be settled by arbitration in the County of Westchester in accordance with such rules and regulations of the American Arbitration Association as may then be in effect.

Defendant argues that this clause binds plaintiff to arbitrate its *qui tam,* retaliatory discharge, and § 191 claims.

### A. Arbitrability of Plaintiff's *Qui Tam* Claim

■■■ Because plaintiff's *qui tam* action is completely outside the scope of the Agreement, it is not covered by the arbitration clause. The Agreement relates solely to the terms of plaintiff's employment by PCCA. However, plaintiff's *qui tam* claims in no way impinge on her employee status. Even if plaintiff had never been employed by defendants, assuming other conditions were met, she would still be able to bring a suit against them for presenting false claims to the gov-

---

6. Citing *United States ex rel. Robinson v. Northrop Corp.,* 149 F.R.D. 142, 147 (N.D.Ill.1993), defendants assert that plaintiff's probationary status precludes her retaliatory discharge claim. In that case, the court stated in passing that an employee's express release of his employer from liability surrounding his termination precluded a retaliatory discharge suit. The relevance of that case to the instant dispute is highly questionable since it interpreted Illinois common law and in the present case the parties have not executed a similar release. Plaintiff's probationary status is not a release of liability from unlawful termination.

ernment. Moreover, as a relator plaintiff stands as a private representative of the government, participating in any recovery to which the government may be entitled. Since the government was not a party to the Agreement, even granting defendants' contention that the arbitration clause encompasses more than employment issues, we are not convinced that plaintiff; suing on the government's behalf, is necessarily bound by its terms. Whether or not that is the case, however, plaintiff's *qui tam* action clearly does not fall within her agreement to arbitrate.[7]

## B. Arbitrability of Plaintiff's § 3730(h) Claim

 Unlike her *qui tam* claims, plaintiff's retaliatory discharge claim involves, at least in part, issues surrounding the employment requirements contained in the Agreement. As the Second Circuit has held, "unless it can be said 'with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute,' the dispute should be submitted to arbitration." *Concourse Village, Inc. v. Local 32E, Service Employees Int'l Union*, 822 F.2d 302, 304 (2d Cir.1987) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). Since the parties have agreed to arbitrate all "disagreements, claims, questions or controversies which may arise out of *or relate to* [the] Agreement," unless otherwise prohibited, under the general federal policy favoring arbitration we must interpret the clause as covering plaintiff's retaliatory discharge claim. *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 991 F.2d 42, 48 (2d Cir.1993); *see also Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that agreement to arbitrate "any dispute, claim or controversy" surrounding employment termination encompassed statutory claims).

In the context of statutory causes of action, the Supreme Court has held that "[h]aving made the bargain to arbitrate, the party should be held to it unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Gilmer*, 500 U.S. at 25, 111 S.Ct. at 1651. Such an intention may be manifested by the statutory language, its legislative history, or "an 'inherent conflict' between arbitration and the [statute's] underlying purposes." *Id.*

Neither § 3730(h)'s express language nor its legislative history mention its amenability to arbitration. Plaintiff, however, argues that the statute's congressionally recognized public purpose is in direct conflict with private dispute resolution, indicating by implication a congressional intent to prohibit arbitration of suits brought under it.

Pointing to legislative history indicating that Congress intended the statute to serve an important deterrent role by facilitating *qui tam* suits brought on behalf of the government, plaintiff argues that the arbitrability of any retaliatory discharge claim is tied to the arbitrability of a *qui tam* action. *See* S.Rep. No. 345 at 6, *reprinted in* 1986 U.S.C.C.A.N. at 5271. Given the public interest in protecting the treasury from fraudulent depletion, and the fact that the government, on whose behalf plaintiff brings her *qui tam* suit, did not agree to arbitrate the FCA claims herein, plaintiff asserts that arbitration is at odds with the policy underlying the entire *qui tam* statutory scheme, including § 3730(h)'s protections for those who bring such suits. We do not agree.

While § 3730(h)'s protections do serve a role in deterring fraud against the government, that particular provision is primarily remedial in nature. We agree with plaintiff that, in the abstract, the existence of § 3730(h) may assure reluctant participants in fraudulent activities that their objections will not result in their being fired and thereby facilitates whistleblowing, a largely deter-

7. Citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991), defendant argues that the FCA permits arbitration of all causes of action arising under it. We need not decide this broad question because the Agreement itself does not bind plaintiff to arbitrate her *qui tam* claims. Therefore, defendants' request to order arbitration of plaintiff's *qui tam* claims must be denied.

rent function. However, the retaliatory discharge suit itself has little, if any, effect on deterring the fraudulent activity. Instead, it is designed to provide a remedy to a relator unlawfully terminated due to her whistleblowing. Plaintiff has made no showing that arbitration will in any way inhibit this function of the statutory scheme. Moreover, plaintiff seeks only monetary damages, a remedy fully available under the instant arbitration agreement. The fact that plaintiff is still offered a forum to fully vindicate her claim ensures that "the statute will continue to serve both its primary remedial and secondary deterrent functions." *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 851 (2d Cir.1987); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 635, 105 S.Ct. 3346, 3358, 87 L.Ed.2d 444 (1985) (remedial nature of antitrust treble damages allowed arbitral resolution of antitrust claim). Therefore, plaintiff's retaliatory discharge claim must be resolved through arbitration.[8]

### C. Arbitrability of Plaintiff's § 191 Claim

■ Categorizing plaintiff's § 191 claim is somewhat more complicated. In her First Amended Complaint, plaintiff claims that she is entitled to wages for her continued employment after her December 16, 1991 termination through January 2, 1992. In addition, she contends that she is entitled to three months severance pay under § 10(E) of the Agreement. That section reads:

[T]he above employee is on probation for a period of twelve (12) months during the first year. During this probation period, the Partnership may dismiss Employee for

any reason or no reason, upon three (3) months written notice by the Partnership, unless the dismissal is for cause pursuant to Section 10A, in which event Partnership shall give two (2) weeks notice.

Plaintiff argues that by failing to pay her for this employment period and/or for three months severance defendants violated the state statute, which provides:

If employment is terminated, the employer shall pay the wages not later than the regular pay day for the pay period during which the termination occurred. . . .

New York Labor Law § 191(3) (McKinney 1986).

In opposing this motion, plaintiff has changed her position somewhat. Citing the December 16, 1991 letter from defendants which served as "notice of the immediate termination of [her] employment," plaintiff now contends that this wage dispute arose after the Agreement had been terminated and therefore its arbitration provisions do not apply. She asserts that the termination letter itself set up an alternate informal employment arrangement not subject to the terminated Agreement's arbitration clause.[9] *See Korody Marine Corp. v. Minerals & Chemicals Philipp Corp.*, 300 F.2d 124, 125 (2d Cir.1962) ("The fact that the parties continued to deal under some sort of informal arrangement does not mean that the terms of the expired formal contract continued to apply."). We do not agree.

First, although the letter states that the employment arrangement was immediately terminated on December 16, it provides for

---

**8.** Even if we were to determine that § 3730(h) was inexorably tied to the FCA's *qui tam* provisions and served an entirely public function, we are not convinced that compelling arbitration of the instant retaliatory discharge claim would necessarily undermine that purpose. The *qui tam* statute specifically allows the government to intervene in any suit brought under it. 31 U.S.C. § 3730(b)(2). Having had an opportunity to intervene and declining to do so, the public, represented by the government, has already protected its interest in this suit.

**9.** That letter provides in pertinent part:
Although the Contract provides that, under these circumstances, the Partnership is required to give only two weeks notice of termi-

nation, we are willing to provide you with a courtesy period of 90 days from today's date during which courtesy period you may receive your present salary. This courtesy period shall remain in effect only if:
1. You devote your full professional time to performance of your duties with the Partnership;
2. You maintain admitting privileges at St. Agnes Hospital;
3. You follow all directives of the Partnership as provided in the agreement;
4. You abide by all remaining terms of the Agreement, including but not limited to Paragraph 11.

three additional months at full pay as a benefit to plaintiff. Specifically, the letter states that PCCA provided this grace period in an effort to comply with, and exceed, the Agreement's requirement that two weeks notice be given for dismissal for cause. Therefore, notwithstanding plaintiff's argument to the contrary, the post-termination employment was pursuant to the notice requirements of the Agreement and disputes arising out of it are subject to the Agreement's arbitration clause.

This position is bolstered by plaintiff's own contention in her First Amended Complaint that defendants are liable for three months severance pay under § 10(E) of the Agreement. Although plaintiff now argues its § 191 action is unrelated to the Agreement, clearly the Agreement forms the basis for her claim and her § 191(3) claim is covered by its arbitration clause.

However, even assuming that the Agreement itself did not cover plaintiff's post-termination employment, our result would not change. The termination letter provides that the three-month grace period "shall remain in effect only if: ... 4. [Plaintiff] abide[s] by all remaining terms of the Agreement...." Therefore, by providing services during this grace period pursuant to the termination letter's provisions, plaintiff agreed to be bound by the terms of the Agreement, including its arbitration clause.

Because plaintiff's § 191 dispute stems either from a breach of the Agreement itself, or from a breach of the termination letter's employment provisions which incorporate the terms of the Agreement, including the arbitration clause, plaintiff must submit this claim to arbitration.

### V.

■ Defendant has also moved to stay all proceedings not referred to arbitration pending resolution of the referred claims. *See Genesco*, 815 F.2d at 856 (2d Cir.1987) ("Broad stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit"). The decision to stay court proceedings pending arbitration rests with the sound discretion of the district court. *Id.* Since plaintiff's § 3730(h) and § 191 claims are distinct from and do not affect the merits of her *qui tam* claims, we see no reason to stay the *qui tam* action pending arbitration of plaintiff's other claims. Therefore, defendants' motion for a stay is denied.

### CONCLUSION

Because plaintiff has demonstrated the existence genuine issues of fact surrounding her *qui tam* and retaliatory discharge claims, defendants' court-converted motion for summary judgment and plaintiff's motion for a continuance are both denied. Defendants' motion to compel arbitration of plaintiff's *qui tam* claims is denied. Defendants' motion to compel arbitration of plaintiff's § 3730(h) and § 191 claims is granted. Defendants' motion for a stay pending arbitration is denied.

SO ORDERED.