**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES and STATE OF NEVADA ex rel. MARY KAYE WELCH; *Plaintiff-Appellee*, <br><br> v. <br><br> MY LEFT FOOT CHILDREN'S THERAPY, LLC; ANN MARIE GOTTLIEB; JONATHAN GOTTLIEB, *Defendants-Appellants.* | No. 16-16070 <br><br> D.C. No. 2:14-cv-01786-MMD-GWF <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Nevada
Miranda M. Du, District Judge, Presiding

Argued and Submitted June 16, 2017
San Francisco, California

Filed September 11, 2017

Before: Mary M. Schroeder, D. Michael Fisher,[*]
and N. Randy Smith, Circuit Judges.

Opinion by Judge Fisher

---

[*] The Honorable D. Michael Fisher, United States Circuit Judge for the U.S. Court of Appeals for the Third Circuit, sitting by designation.

## SUMMARY[**]

**False Claims Act**

The panel affirmed the district court's denial of the defendants' motion to compel arbitration on the alternate ground that relator Mary Kay Welch's False Claims Act claims did not fall within the scope of the arbitration agreement with Welch's former employer, defendant My Left Foot Children's Therapy, LLC.

Welch alleged that her former employer violated the federal and Nevada False Claims Acts by presenting fraudulent Medicaid claims. The United States and Nevada declined to intervene in the case and her employer moved to compel arbitration under the Federal Arbitration Act.

The panel held that this lawsuit was not arbitrable because the plain text of Welch's arbitration agreement that she signed when she applied for employment with My Left Foot did not encompass this False Claims Act case.

## COUNSEL

Rex S. Heinke (argued) and Jessica M. Weisel, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, California; Shawn Hanson and Kelli Ann Kiernan, Akin Gump Strauss Hauer & Feld LLP, San Francisco, California; for Defendants-Appellants.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Robert S. Oswald, David Scher, and Andrew M. Witko, The Employment Law Group P.C., Washington, D.C., for Plaintiff-Appellee.

Lindsey Powell (argued) and Michael S. Raab, Assistant United States Attorneys, Appellate Staff; Civil Division, United States Department of Justice, Washington, D.C.; for Amicus Curiae United States.

Mark J. Kreuger (argued), Senior Deputy Attorney General; Adam Paul Laxalt, Attorney General; Office of the Attorney General, Carson City, Nevada; for Amicus Curiae State of Nevada.

## OPINION

FISHER, Circuit Judge:

Originally enacted in 1863, the False Claims Act (FCA) establishes a scheme that permits either the Attorney General, 31 U.S.C. § 3730(a), or a private party, § 3730(b), to maintain a civil action against "any person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment" to an employee of the United States government. § 3729(a). When brought by a private party, an "enforcement action under the FCA is called a *qui tam* action, with the private party referred to as the relator." *United States ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 932 (2009) (internal quotation marks omitted). And when a relator initiates a FCA action, the United States has 60 days to review the complaint and decide whether it will intervene in the case. § 3730(b)(2), (4).

When the government intervenes, it assumes "the primary responsibility for prosecuting the action, and shall not be bound by an act of the [relator]." § 3730(c)(1). When it does not intervene, it is not a "party" to a FCA action for the purposes of certain procedural rules. *See Eisenstein*, 556 U.S. at 931. Nonetheless, the United States maintains some minimal involvement in all FCA actions. For example, in every FCA case, it remains "a 'real party in interest,'" *id.* at 930, and retains specific statutory rights including rights to "intervene at a later date upon a showing of good cause," § 3730(c)(3), request service of pleadings and deposition transcripts, § 3730(c)(3), and veto a relator's decision to voluntarily dismiss the action, § 3730(b)(1).

In this case, Mary Kaye Welch alleges that her former employer violated the federal FCA and Nevada FCA by presenting fraudulent Medicaid claims. The United States and Nevada declined to intervene in the case and her employer moved to compel arbitration under the Federal Arbitration Act (FAA), 9 U.S.C. § 1 *et seq.* Holding that Welch had entered into a valid arbitration agreement that covers this FCA case, the District Court nonetheless declined to enforce that arbitration agreement. In its view, because FCA claims belong to the government and neither the United States nor Nevada agreed to arbitrate their claims, sending this dispute to arbitration would improperly bind them to an agreement they never signed. Though the question of the enforceability of a relator's agreement to arbitrate FCA claims is interesting, our holding rests on a rather unremarkable textual analysis. Since we conclude that the plain text of Welch's arbitration agreement does not encompass this FCA case, this lawsuit is not arbitrable, and we will affirm the District Court's denial of the Defendants' motion to compel arbitration on that alternate ground.

# I.

In August 2013, Mary Kaye Welch applied for employment with My Left Foot Children's Therapy, LLC (MLF), a small, family-owned company that provides functional therapy to children in the Las Vegas area. She was hired as a speech therapist that September and worked at MLF for just over a year. During the application process, Welch entered into a mutually binding arbitration agreement with MLF that provides:

> I agree and acknowledge that the Company and I will utilize binding arbitration to resolve all disputes that may arise out of the employment context. Both the Company and I agree that any claim, dispute, and/or controversy that either I may have against the Company . . . or the Company may have against me, arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or employment or other association with the Company shall be submitted to and determined exclusively by binding arbitration under the Federal Arbitration Act . . . . To the extent permitted by applicable law, the arbitration procedures stated below shall constitute the sole and exclusive method for the resolution of *any claim* between the Company and Employee arising out of 'or related to' the employment relationship.

ER 20 (underlining in original). The agreement then adds:

> Included within the scope of this agreement are all disputes, whether they be based on the

state employment statutes, Title VII of the
Civil Rights Act of 1964, as amended, or any
other state or federal law or regulation,
equitable law, or otherwise, with exception of
claims arising under the National Labor
Relations Act which are brought before the
National Labor Relations Board, claims
brought pursuant to state workers
compensation statutes, or as otherwise
required by state or federal law.

*Id*.

Shortly before Welch left MLF, she filed a sealed
complaint in federal court alleging that MLF and its co-
owners—Ann Marie and Jonathan Gottlieb—violated both
the federal FCA and the Nevada FCA[1] by presenting
fraudulent claims to Medicaid and Tricare, a program that
offers Medicaid-like benefits to service members. In 2015,
the United States and Nevada declined to intervene and
Welch amended her complaint. In that amended complaint,
Welch alleges that MLF treated patients who could not
benefit from therapy, provided and billed for unnecessary
treatment, ordered therapists to draft inaccurate patient
progress reports, and told therapists to use a single billing
code for all services regardless of whether a more
appropriate code would result in lower charges.

On October 19, 2015, the Defendants moved to compel
arbitration of Welch's FCA claims pursuant to the FAA and

---

[1] Because we resolve this case based on the text of Welch's
arbitration agreement, any distinctions between the federal FCA and
Nevada FCA are immaterial to our holding. We will accordingly refer to
both sets of claims collectively as "FCA claims."

MLF's arbitration agreement with Welch. Welch opposed that motion as did the United States and Nevada. On June 13, 2016, the District Court denied the Defendants' motion to compel arbitration on the ground that Welch's arbitration agreement did not extend to the United States or Nevada, the parties which owned the underlying FCA claims. This timely appeal followed.

## II.

The District Court had jurisdiction under 28 U.S.C. § 1331 and 31 U.S.C. § 3732. We have jurisdiction under 9 U.S.C. § 16(a)(1) and 28 U.S.C. § 1291. We review a district court's decision to grant or deny a motion to compel arbitration de novo. *Sakkab v. Luxottica Retail N. Am., Inc.*, 803 F.3d 425, 429 (9th Cir. 2015).

## III.

On appeal, the Defendants argue that we should reverse the district court's denial of their motion to compel arbitration. They maintain that MLF's arbitration agreement with Welch encompasses this FCA lawsuit and that the government cannot prevent enforcement of an arbitration agreement covering FCA claims when, as here, it has declined to intervene in the underlying FCA suit. In addressing those arguments, we must first determine whether Welch's arbitration agreement with MLF encompasses the FCA claims at issue in this case.

## A.

Seeking "to reverse the longstanding judicial hostility to arbitration agreements" and place them "upon the same footing as other contracts," *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991), Congress enacted the

FAA in 1925. Under the FAA, private agreements to arbitrate are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Since the FAA "mandates . . . arbitration on issues as to which an arbitration agreement has been signed," *Dean Witter Reynolds*, *Inc. v. Byrd*, 470 U.S. 213, 218 (1985), when, as here, an arbitration agreement involves "a contract evidencing a transaction involving commerce," 9 U.S.C. § 2, our role is limited "to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp v. Ortho Diagnostic Sys., Inc*., 207 F.3d 1126, 1130 (9th Cir. 2000).

In this case, Welch does not argue that her arbitration agreement with MLF is invalid. Instead, she maintains that these FCA claims do not fall within its scope because, contrary to what the District Court held, none of them are related to, arose out of, or were connected with her employment or other association with MLF. This argument turns on interpretation of her arbitration agreement with MLF—"a matter of contract" that requires us "to honor parties' expectations." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 351 (2011).

## Governing Law

Before turning to the text of Welch's arbitration agreement, we must first determine the governing law. Under the FAA, the "interpretation of an arbitration agreement is generally a matter of state law," *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp*., 559 U.S. 662, 681 (2010), and since the arbitration agreement in this case was signed in Nevada by a Nevada resident and a Nevada-based LLC, the parties agree that Nevada law would govern any contract dispute here. In applying Nevada law to interpret Welch's

arbitration agreement, however, "the FAA imposes certain rules of fundamental importance" that must also guide our interpretation "including the basic precept that arbitration is a matter of consent, not coercion," *id.* (internal quotation marks omitted), and the rule that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

"Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements," *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002) (internal quotation marks omitted), when examining the scope of an arbitration agreement, "[a]s with any other contract dispute, we first look to the express terms [of the parties' agreement]." *Chiron*, 207 F.3d at 1130. If the text is plain and unambiguous, that is the end of our analysis in this case because we "must rigorously enforce arbitration agreements according to their terms" under both the FAA and Nevada law. *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013) (internal quotation marks omitted); *see also Waffle House*, 534 U.S. at 294 ("While ambiguities in the language of the agreement should be resolved in favor of arbitration, . . . we do not override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated."); *State ex rel Masto v. Second Judicial Dist. Ct. ex rel. Cty. of Washoe,* 199 P.3d 828, 832 (Nev. 2009) ("In interpreting a contract, we construe a contract that is clear on its face from the written language, and it should be enforced as written.").

### The Arbitration Agreement

Turning now to the text, the arbitration agreement that Welch signed when she applied for employment with MLF

contains two key sections. The first section, which is titled "Agreement," includes three separate iterations of an agreement to arbitrate. The second section, which is titled "Included Claims," provides that minus limited exceptions not applicable here, the scope of the arbitration agreement includes "all disputes, whether they be based on the state employment statutes, Title VII of the Civil Rights Act of 1964, as amended, or any other state or federal law or regulation." ER 20.

On appeal, the Defendants rely on the presumption in favor of arbitration, the breadth of the "Agreement" section, and the breadth of the "Included Claims" section to maintain that Welch's arbitration agreement covers the FCA claims at issue in this case. In our view, however, it is solely the text of the "Agreement" section that dictates the scope of Welch's arbitration agreement. Since the presumption of arbitrability is not in play if the text of the agreement is clear, that presumption plays no role unless the agreement is susceptible to an interpretation that covers this FCA case. And since it would violate several rules of textual interpretation to rely on the "Included Claims" section to define the breadth of the agreement, we believe that section is irrelevant to assessing the scope of Welch's agreement unless the "Agreement" section first provides for arbitration.

Certainly, as the Defendants point out, the "Included Claims" section is broad and encompasses FCA claims insofar as it provides that "all disputes," including those based on "any . . . federal law," fall within the scope of the arbitration agreement. ER 20. There are nonetheless two problems with relying on this section to assess whether this case is subject to arbitration. First, the "Included Claims" section contains no agreement to arbitrate any disputes— rather, the "Agreement" section defines when the parties

have agreed to arbitration while the "Included Claims" section explains the types of disputes that arbitration extends to when the parties have elsewhere agreed to arbitration. Second, the breadth of the "Included Claims" section cannot be read in isolation from the rest of the arbitration agreement, and the "Agreement" section provides for arbitration in much narrower circumstances than the "Included Claims" section.

This second point is particularly critical because had the parties wished to arbitrate every dispute encompassed in the "Included Claims" section it could have left the scope of the "Agreement" section at "any and all disputes whatsoever." Instead, every provision in the "Agreement" section containing an agreement to arbitrate is followed by some plain language imposing a textual limitation that, to be arbitrable, the dispute must arise from, relate to, or be connected with Welch's employment or association with MLF. Having chosen to include that language, we are bound to define the scope of this agreement by those limitations under two cardinal rules of textual interpretation. The first is the rule that the specific governs the general, or *generalia specialibus non derogant*, because the "Agreement" section is more specific than the "Included Claims" section. *See, e.g.*, *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 891 (9th Cir. 2003) ("A standard rule of contract interpretation is that when provisions are inconsistent, specific terms control over general ones."); *Shelton v. Shelton*, 78 P.3d 507, 510 (Nev. 2003) ("[A] specific provision will qualify the meaning of a general provision."). The second is the interpretative principle of *verba cum effectu sunt accipienda*—that if possible, every word and every provision is to be given effect—because if the language about arising out of and relating to employment did not limit the scope of the arbitration agreement to those situations, it

would have no purpose. *See, e.g.*, *United States v. Butler*, 297 U.S. 1, 65 (1936) ("These words cannot be meaningless, else they would not have been used."); *Sturges v. Crowinshield*, 17 U.S. (4 Wheat.) 122, 202 (1819) ("It would be dangerous in the extreme, to infer from extrinsic circumstances, that a case for which the words of an instrument expressly provide, shall be exempted from its operation."); *Quirron v. Sherman*, 846 P.2d 1051, 1053 (Nev. 1993) ("It is a well established principle of contract law . . . that where two interpretations of a contract provision are possible, a court will prefer the interpretation which gives meaning to both provisions rather than an interpretation which renders one of the provisions meaningless.").

Having established that the scope of this arbitration agreement turns solely on the text of the "Agreement" section, we must now consider whether the text of the "Agreement" section is broad enough to encompass this lawsuit. As discussed above, the "Agreement" contains three different arbitration provisions. The first provision provides for arbitration of "all disputes that may arise out of the employment context." ER 20. The second provision provides for arbitration of "any claim, dispute, and/or controversy that either I may have against the Company . . . or the Company may have against me arising from, related to, or having any relationship or connection whatsoever with my seeking employment by, or employment or other association with the Company." *Id*. The third provision provides for arbitration of "*any claim* between the Company and Employee arising out of 'or related to' the employment relationship." *Id*. (underlining in original).

Like the "Included Claims" section, these provisions are broad and capable of expansive reach. But as this Court has

noted, there is a difference between a clause being "broad" and "unlimited." *N. Cal. Newspaper Guild Local 52 v. Sacramento Union*, 856 F.2d 1381, 1383 (9th Cir. 1988). The first arbitration provision is limited to disputes that "arise out of the employment context" while the third is limited to claims "arising out of or 'related to' the employment relationship." ER 20. And for three reasons, we cannot hold that the text of the first or third provision is broad enough to encompass this case.

First, contrary to Defendants' position, the terms used in the limiting language of the first and third provisions are not boundless because both of the phrases, "arising out of" and "related to," mark a boundary by indicating some direct relationship. As we have held, the words arising out of are "relatively narrow as arbitration clauses go," *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (internal quotation marks omitted), and "understood to mean originating from[,] having its origin in, growing out of or flowing from." *Cont'l Cas. Co v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir. 1985) (internal quotation marks omitted). And though we have recognized that the phrase "relate to" is broader than the phrases "arising out of" or "arising under," we agree with the Eleventh Circuit that "'related to' marks a boundary by indicating some direct relationship; otherwise the term would stretch to the horizon" and "have no limiting purpose" in violation of the cannon of *verba cum effectu sunt accipienda*. *Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204, 1218 (11th Cir. 2011); *see also N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (noting that if the phrase "relate to were taken to extend to the furthest stretch of its indeterminacy," it would be meaninglessly empty because "relations stop nowhere" (internal quotation marks omitted)).

Second, we are persuaded by the reasoning of the Fifth and Eleventh Circuits, which have previously interpreted arbitration agreements covering disputes that "arise out of" or "relate to" a contractual or employment relationship. Though neither circuit decided this issue in the context of a FCA claim, we find their textual analysis compelling and instructive. In both cases, the courts found that a plaintiff's sexual assault claims did not "arise out of" or "relate to" the plaintiff's employment or workplace simply because the assault occurred at the plaintiff's workplace or would not have occurred but for the plaintiff's employment. As both circuits explained, the sexual assault did not "arise out of" or "relate to" the plaintiffs' employment because there was no direct connection between their claims and employment where the defendant "could have engaged in" the same conduct "even in the absence of any contractual or employment relationship with [the plaintiff]," and a third party "could have brought the[] same claims . . . based on virtually the same alleged facts." *Doe*, 657 F.3d at 1219–20; *see also Jones v. Halliburton Co.*, 583 F.3d 228, 240 (5th Cir. 2009). The same is true here—this FCA suit has no direct connection with Welch's employment because even if Welch "had never been employed by defendants, assuming other conditions were met, she would still be able to bring a suit against them for presenting false claims to the government." *Mikes v. Strauss*, 889 F. Supp. 746, 754 (S.D.N.Y. 1995).

Finally, the fact that Welch observed the fraud while employed is immaterial under the first and third arbitration provisions. Since, contrary to what the District Court held, neither clause applies to "claims aris[ing] from observations Welch made while employed by MLF," *United States v. My Left Food Children's Therapy, LLC*, No. 14-01786, 2016 WL 3381220, at *3 (D. Nev. June 13, 2016), to interpret this

clause to cover all disputes discovered while Welch worked at MLF would be "to read the arbitration provision so broadly as to encompass any claim related to [her] *employer*, or any incident that happened *during her employment*" whereas "that is not the language of the contract." *Jones*, 583 F.3d at 241. Indeed, because Welch could have just as easily discovered the factual predicate of her claims in a different capacity, because Defendants could have engaged in the same fraudulent conduct absent any relationship with Welch, and because the legal basis of this FCA case would exist regardless of where Welch worked or observed the fraud, it is MLF's act of fraudulent billing—rather than Welch's employment—that these FCA claims "arise out of" and "relate to."

Since neither the first nor third arbitration provision is broad enough to encompass this FCA case, the lawsuit is arbitrable only if it falls within the scope of the second arbitration provision. As Defendants note, this provision is clearly the broadest and may not require a direct relationship with Welch's employment insofar as the phrase "any relationship or connection whatsoever with" is much broader than the phrases "arising out of" and "related to." But we must again look carefully at the text of this provision, which indicates that it only covers a "claim, dispute, and/or controversy that either [Welch] may have against [MLF] . . . or [MLF] may have against [Welch]." ER 20.

Contrary to Defendants' arguments, this case does not meet that textual requirement. This case involves no claim that MLF has against Welch. Nor can it be said to be a claim, dispute, or controversy that Welch "may have against [MLF]." ER 20. Indeed, though the FCA grants the relator the right to bring a FCA claim on the government's behalf, an interest in the outcome of the lawsuit, and the right to

conduct the action when the government declines to intervene, our precedent compels the conclusion that the underlying fraud claims asserted in a FCA case belong to the government and not to the relator. *See, e.g.*, *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000) (Noting that the "FCA can reasonably be regarded as effecting a partial assignment of *the Government's damages claim*." (emphasis added)); *Stoner v. Santa Clara Cty. Office of Educ.*, 502 F.3d 1116, 1126 (9th Cir. 2007) ("The FCA makes clear that notwithstanding the relator's statutory right to the government's share of the recovery, the underlying claim of fraud always belongs to the government."); *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 768 (9th Cir. 1997) ("[A] qui tam plaintiff by definition asserts not his own interests, but only those of United States.").[2] The meaning of the verb "have" is "to hold in the hand or in control; own; possess." *Have*, Webster's New World College Dictionary (5th ed. 2014). Consequently, because FCA fraud claims always belong to

---

[2] *Stoner* is particularly instructive here. In *Stoner*, we concluded that a relator cannot pursue a FCA claim pro se. 502 F.3d at 1126–28. A pro se plaintiff can only "prosecute his own action in *propria persona*," and "has no authority to prosecute an action in federal court on behalf of others." *Id*. at 1126. Because a FCA claim is the government's claim—and not the relator's claim—and because the FCA does not allow relators to pursue any interest they might have in the claim separately from the government, we concluded that a pro se plaintiff could not bring such a claim. *Id*. at 1126–28. Thus, even where, as here, "the government chooses not to intervene, a relator bringing a *qui tam* action for a violation of [the FCA] is representing the interest of the government and prosecuting the action on its behalf." *Id*. at 1126. A relator only has "the right to bring suit *on behalf of the government*." *Id*. (quoting *United States ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 743 (9th Cir. 1993)). We find no grounds upon which to distinguish our holding in *Stoner* from the contract language at issue here.

the government, Welch cannot be said to own or possess them, and the FCA claims at issue in this case do not meet this arbitration clause's requirement that the claim must be one that Welch "have against [MLF]."[3] E.R. 20. Since this second clause, like the other two, is not broad enough to encompass this FCA case, this suit does not fall within the scope of Welch's arbitration agreement and is not arbitrable.

## IV.

For the reasons set forth above, we affirm the District Court's denial of the Defendants' motion to compel arbitration on the alternate ground that Welch's FCA claims do not fall within the scope of her arbitration agreement with MLF.

**AFFIRMED.**

---

[3] In so holding, we note that, once again, had the parties wished to agree to arbitrate FCA claims, they were free to draft a broader agreement that covers "any lawsuits brought or filed by the employee whatsoever" or "all cases Welch brings against MLF, including those brought on behalf of another party." But having instead drafted a more limited clause that covers only those claims that Welch, rather than the government, has, Defendants cannot now argue that we should ignore this textual limitation.