# Syllabus

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.

Reporter of Decisions:
Kathryn L. Loomis

LICHON v MORSE
SMITS v MORSE

Docket Nos. 159492 and 159493. Argued October 8, 2020 (Calendar No. 2). Decided July 20, 2021.

In Docket No. 159492, Samantha Lichon brought an action in the Oakland Circuit Court against Michael Morse and Michael J. Morse, PC (the firm), alleging workplace sexual harassment in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*; negligent and intentional infliction of emotional distress; negligence, gross negligence, and wanton and willful misconduct; and civil conspiracy. Lichon also alleged sexual assault against Morse. Lichon worked as a receptionist at the firm from September 2015 until her termination in April 2017. Lichon alleged that throughout her employment with the firm, she was sexually harassed by Morse and that she was sexually assaulted by Morse on multiple occasions. According to Lichon, Morse repeatedly groped her breasts without permission and touched her while making sexual comments. Although Lichon reported the incidents to the firm's human resources department, no action was taken and Morse's conduct continued. After she was terminated, Lichon was contacted by an attorney from the firm who pressured her not to file any action against Morse or the firm. Lichon filed her action in May 2017, and defendants moved to dismiss and compel arbitration on the basis that Lichon was required to arbitrate her claims pursuant to the firm's Mandatory Dispute Resolution Procedure agreement (MDRPA), which she had signed upon being hired at the firm. The trial court, Shalina Kumar, J., granted defendants' motion, finding that the arbitration agreement was valid and enforceable and that all of Lichon's claims fell under the agreement. Lichon appealed in the Court of Appeals.

In Docket No. 159493, Jordan Smits filed an action in the Wayne Circuit Court against the same defendants in May 2017, alleging workplace harassment in violation of the ELCRA; negligent and intentional infliction of emotional distress; and negligence, gross negligence, and wanton and willful misconduct. Smits later filed a second complaint against Morse individually, alleging sexual assault and battery, negligent and intentional infliction of emotional distress; and negligence, gross negligence, and willful and wanton misconduct. Smits was employed as a paralegal at the firm. In December 2015, she attended the firm's Christmas party. At the party, according to Smits, Morse approached her from behind and grabbed her breasts. Smits reported the assault to human resources, but no action was taken. Smits later resigned and declined to accept two weeks' severance pay in exchange for signing a nondisclosure agreement. Defendants

moved to dismiss and compel arbitration, citing the MDRPA, which Smits had signed when she began working for the firm. The trial court, Daniel A. Hathaway, J., granted defendants' motion, concluding that the arbitration agreement was valid and enforceable and that Smits's claims were related to her employment and therefore subject to arbitration. Smits appealed in the Court of Appeals. The Court of Appeals, JANSEN, P.J., and BECKERING, J., (O'BRIEN, J., dissenting), consolidated all three cases and affirmed the trial court's dismissal of Smits's complaint against Morse individually but reversed the circuit court rulings in the other two cases. 327 Mich App 375 (2019). The Court of Appeals majority concluded that plaintiffs' claims of sexual assault were not subject to arbitration because sexual assault was not "related to" plaintiffs' employment. Further, the Court of Appeals stated that the fact that the alleged assaults would not have occurred but for plaintiffs' employment with the firm did not provide a sufficient nexus between the terms of the arbitration agreement and the alleged sexual assaults. The Supreme Court granted defendants' application for leave to appeal. 504 Mich 962 (2019).

In an opinion by Justice CAVANAGH, joined by Chief Justice MCCORMACK and Justices BERNSTEIN and CLEMENT, the Supreme Court *held*:

The threshold question of whether a dispute is subject to arbitration is for a court to determine. Michigan public policy generally favors arbitration, but arbitration is a matter of contract, and a party cannot be required to arbitrate an issue that the party did not agree to submit to arbitration. The MDRPA expressly limited its application to matters relative to employment. Therefore, whether the MDRPA prevented plaintiffs from litigating their claims against defendants depended on whether their claims were relative to their employment. Defendants noted certain facts that supported connections between plaintiffs' claims and their employment, including that the alleged assaults occurred at work or work-related functions. But those facts did not necessarily make plaintiffs' claims relative to employment; rather, the facts had to be evaluated under a standard that distinguished claims relative to employment from claims not relative to employment. Other jurisdictions evaluate motions to compel arbitration by asking whether the plaintiff's claim can be maintained without reference to the contract or relationship at issue. This analysis prevents the absurdity of an arbitration clause that bars the parties from litigating any matter, regardless of how unrelated to the substance of the agreement, and it ensures that the mere existence of a contract does not mean that every dispute between the parties is arbitrable. Neither the circuit courts nor the Court of Appeals considered this standard when evaluating defendants' motions to compel arbitration. Rather than apply this newly adopted approach in the first instance, the Michigan Supreme Court vacated the judgment of the Court of Appeals and remanded the cases to the circuit courts so that those courts could analyze defendants' motions to compel arbitration by determining which of plaintiffs' claims could be maintained without reference to the contract or employment relationship.

Court of Appeals judgment vacated and cases remanded to the circuit courts.

Justice VIVIANO, joined by Justice ZAHRA, dissenting, asserted that a proper interpretation of the language of the contract showed that plaintiffs' claims against the firm were arbitrable and that their claims against Morse were arbitrable if he was able to invoke the arbitration clause, despite not being a signatory to the contract. The general scope of arbitrability was established in the contract: the agreement was to apply to "all concerns [employees] have over the Firm's Policies and Procedures relative to . . . employment." The agreement specifically included disputes over

violations of state employment law, and both plaintiffs had alleged violations of the ELCRA, which prohibits sexual assaults that create a hostile work environment. Accordingly, plaintiffs' claims arising under the ELCRA were arbitrable under the agreement. Regarding plaintiffs' other claims, under the agreement, any "concern" an employee had about how the firm's policies were applied to him or her was arbitrable, and the agreement did not limit arbitration on the basis of the legal cause of action. Under the contract, a "concern" that was subject to arbitration was one that arose from how the firm's policies and procedures were applied or interpreted relative to the plaintiff's employment. This interpretation of the contract excluded only an employee's concerns over the application of policies or procedures not related to that employee, such as concerns regarding their application to another employee. Given that the firm's policies specifically proscribed sexual harassment and unwanted sexual contact, plaintiffs' allegations involved concerns with how the firm's policies were applied to them relative to their employment and were therefore arbitrable under the agreement. However, given that Morse did not sign the agreement in his individual capacity, Justice VIVIANO would have remanded the cases for a determination of whether Morse could compel arbitration as a nonsignatory to the contract.

Justice WELCH did not participate in the disposition of this case because the Court considered it before she assumed office.

# OPINION

Chief Justice:
Bridget M. McCormack

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Elizabeth T. Clement
Megan K. Cavanagh
Elizabeth M. Welch

FILED July 20, 2021

STATE OF MICHIGAN

SUPREME COURT

SAMANTHA LICHON,

        Plaintiff-Appellee,

v

No. 159492

MICHAEL MORSE and MICHAEL J. MORSE, PC,

        Defendants-Appellants.

_____

JORDAN SMITS,

        Plaintiff-Appellee,

v

No. 159493

MICHAEL MORSE and MICHAEL J. MORSE, PC,

        Defendants-Appellants.

_____

BEFORE THE ENTIRE BENCH (except WELCH, J.)

CAVANAGH, J.

In these cases, the Court must determine whether plaintiffs' claims fall within the scope of arbitration agreements limited to matters that are "relative to" plaintiffs' employment. Whether plaintiffs' allegations of sexual assault, and the multiple claims stemming from those allegations, are relative to plaintiffs' employment is resolved by asking whether the claims can be maintained without reference to the contract or relationship at issue. Because the lower courts did not have the benefit of this framing, we vacate the decision of the Court of Appeals and remand these cases to the circuit courts for reconsideration of whether plaintiffs' claims are subject to arbitration. Because plaintiffs also did not have the benefit of this framing when filing their claims, plaintiffs may seek to amend their complaints before the circuit courts make this determination.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs Samantha Lichon and Jordan Smits both worked for defendant Michael J. Morse, PC, doing business as the Mike Morse Law Firm (the Morse firm). Upon their hire, each plaintiff signed the Morse firm's "Mandatory Dispute Resolution Procedure" agreement (MDRPA). Defendant Michael Morse was the sole shareholder of the firm and exercised significant control over its operations, serving as its president, secretary, treasurer, and director. Both plaintiffs sued Morse and the Morse firm, alleging that Morse sexually assaulted them.

Lichon started working at the Morse firm as a receptionist in September 2015. Lichon alleges that "[t]hroughout the course of her employment," she was "continuously and periodically sexually harassed" by Morse. Morse "sexually assaulted" her "when he

2

groped her breasts without invitation, permission, or inducement on multiple occasions." Morse "touched his groin to her rear while audibly stating sexual comments, including but not limited to, 'you make me so hard' and 'I want to take you into my office,' " on multiple occasions, without invitation, permission, or inducement. Lichon complained to her superiors at the Morse firm and to the human resources department, but no action was taken, and the sexual harassment and sexual assaults continued. On March 29, 2017, Lichon was placed on "Final Warning Status" for poor performance, and she was fired on April 7, 2017. On May 15, 2017, Lichon was contacted by Derek Brackon, an attorney at the Morse firm, who asked Lichon if she was going to sue Morse and "pressured and/or coerced and/or intimidated and/or attempted to persuade" her not to take any action against Morse or the Morse firm.

Lichon filed suit against both defendants alleging workplace sexual harassment in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq.*; negligent and intentional infliction of emotional distress; and negligence, gross negligence, and wanton and willful misconduct. She also alleged sexual assault against Morse. Lichon filed an amended complaint adding an allegation of civil conspiracy based on defendants' efforts to intimidate her to not file a lawsuit.

In lieu of filing an answer, defendants moved to dismiss and compel arbitration under MCR 2.116(C)(7), arguing that the MDRPA required Lichon to arbitrate her claims. Lichon responded that the MDRPA's scope was limited to matters which "arise out of her employment," and because her claims were related to the sexual assault they did not "arise out of her employment" at the Morse firm. She also argued that the MDRPA was unenforceable as a matter of law because it is unconscionable, illusory, and contrary to

3

public policy. The trial court granted defendants' motion, finding that the MDRPA was "a valid and enforceable arbitration agreement" and that Lichon's claims were "inextricably intertwined and therefore all f[e]ll within the arbitration agreement and the workplace policies." Lichon appealed in the Court of Appeals.

Smits worked at the Morse firm as a paralegal, and in December 2015, she attended an office Christmas party. She alleged that Morse sexually assaulted her at the party. Morse approached her from behind and grabbed her breasts. She immediately grabbed his arms and yanked them away from her. Multiple guests witnessed the assault. When Smits reported the assault to the firm's human resources department, the firm's representative told Smits that the "number one priority [was] to protect Morse's reputation." When Smits expressed her concerns to an attorney employed at the Morse firm who witnessed the assault, he said, "[W]hat was I supposed to do, you know how Michael is." Smits resigned by e-mail in February 2016. She was offered two weeks of severance pay if she would sign a nondisclosure agreement, but she declined. An employee of the Morse firm warned her to be careful because Morse "knows a lot of people in the legal community," and he "could make it difficult for [Smits] to get a job."

Smits first filed suit on May 30, 2017. She alleged workplace sexual harassment in violation of the ELCRA; negligent and intentional infliction of emotional distress; and negligence, gross negligence, and wanton and willful misconduct against both defendants. Smits also alleged sexual assault against Morse. In lieu of an answer, defendants moved to dismiss and compel arbitration under MCR 2.116(C)(7).[1] Like Lichon, Smits argued

_____

[1] Defendants alternatively argued that Smits's claims were barred by the statute of limitations. Smits signed an "Acknowledgement Form" in the Morse firm's Employee

4

that her claims of sexual assault were not related to her employment, so they were not governed by the MDRPA. She also argued that the arbitration provision was unenforceable because it is procedurally and substantively unconscionable and illusory, that defendants forfeited enforcement of the MDRPA by failing to adhere to its process, and finally, that Morse could not invoke the MDRPA because he is not a party to the agreement. The trial court granted defendants' motion, finding that the MDRPA is "a valid and enforceable agreement, supported by consideration and mutuality of obligation," and that Smits's claims were related to her employment and therefore subject to arbitration. Smits appealed in the Court of Appeals.

On July 25, 2017, Smits filed a second complaint against only Morse, alleging sexual assault and battery; negligent and intentional infliction of emotional distress; and negligence, gross negligence, and willful and wanton misconduct. The trial court granted a motion to dismiss under MCR 2.116(C)(7), concluding that the action was precluded by res judicata and compulsory joinder. Smits appealed in the Court of Appeals.

Before discussing the Court of Appeals' analysis, it's important to set out the relevant texts. The MDRPA signed by both plaintiffs states in pertinent part:

> This Mandatory Dispute Resolution Procedure shall apply to all concerns you have over the application or interpretation of the Firm's Policies and Procedures relative to your employment, including, but not limited to, any

Policy Manual, which states in relevant part:

> I agree that any claim or lawsuit relating to my employment with Michael J. Morse, P.C. must be filed no more than six (6) months after the date of employment action that is the subject of the claim or lawsuit unless a shorter period is provided by law. I waive any statute of limitations to the contrary.

5

disagreements regarding discipline, termination, discrimination or violation of other state or federal employment or labor laws. This includes any claim over the denial of hire. This Procedure includes any claim against another employee of the Firm for violation of the Firm's Policies, discriminatory conduct or violation of other state or federal employment or labor laws. Similarly, should the Firm have any claims against you arising out of the employment relationship, the Firm also agrees to submit them to final and binding arbitration pursuant to this Procedure.

\* \* \*

The only exceptions to the scope of this Mandatory Dispute Resolution Procedure shall be for questions that may arise under the Firm's insurance or benefit programs (such as retirement, medical insurance, group life insurance, short-term or long-term disability or other similar programs). These programs are administered separately and may contain their own separate appeal procedures. In addition, this Procedure does not apply to claims for unemployment compensation, workers' compensation or claims protected by the National Labor Relations Act. While this Procedure does not prohibit the right of an employee to file a charge with the Equal Employment Opportunity Commission ("EEOC") or a state civil rights agency, it would apply to any claims for damages you might claim under federal or state civil rights laws. In addition, either Party shall have the right to seek equitable relief in a court of law pending the outcome of the arbitration proceeding.

The Court of Appeals summarized the process required by the MDRPA:

[F]irst, within one year an employee must file with a direct supervisor a "request for review of your concern stating your disagreement or concern and the action you request the Firm to take." The supervisor will date the request, provide the employee with a copy, and then "generally schedule a meeting with [the employee] to hear [the employee's] concerns and will provide [the employee] with a written decision within" 15 business days. Second, if the dispute is not resolved to the employee's satisfaction, a written request for review must be filed directly with Morse within 15 days. Morse, or his "designated representative," will issue a written decision within 15 days. If the employee is still not satisfied, the final recourse is to submit a written request for arbitration to the firm within 15 days, and the employee "must deposit with the Firm $500.00 or Five (5) Days' pay, whichever is less." [*Lichon v Morse*, 327 Mich App 375, 382-383; 933 NW2d 506 (2019) (emphasis omitted).]

6

Smits also signed an "Agreement for At-Will Employment and Agreement for Resolution of Disputes," which provided in relevant part:

IV. <u>ARBITRATION OF DISPUTES</u>:

As a condition of my employment, I agree that any dispute or concern relating to my employment or termination of employment, including but not limited to claims arising under state or federal civil rights statutes, must be resolved pursuant to the Firm's [MDRPA] which culminates in final and binding arbitration. I have been provided with a copy of the Firm's [MDRPA] and agree to be bound by this Dispute Procedure.

The Morse firm's employee manual has an "Anti-Discrimination, Harassment, and Retaliation Policy," which defines sexual harassment broadly and purports to include physical harassment that creates a hostile or offensive work environment within that definition. The manual provides that "[t]his policy covers all employees." The policy specifically states as follows:

**Anti-Discrimination, Harassment, and Retaliation Policy**

Sexual harassment, whether verbal, written, physical or environmental, is unacceptable and will not be tolerated. Sexual harassment is defined as unwelcome or unwanted conduct of a sexual nature (verbal, written, physical or environment[al]) when:

1. Submission to or rejection of this conduct is used as a factor in decisions affecting hiring, evaluation, promotion or other aspects of employment; and/or
2. Conduct substantially interferes with an individual's employment or creates an intimidating, hostile or offensive work environment.

The Court of Appeals consolidated all three cases and affirmed the trial court with regard to Smits's complaint against Morse individually, but reversed the trial court decisions in the other two cases in a published, split decision. *Lichon*, 327 Mich App at

7

379-380. The majority noted that the parties had agreed as to the existence of the MDRPA and its terms but disagreed as to whether sexual assault by a supervisor or employer was covered. So, the majority reasoned, this was the "sole issue" to be decided on appeal. The majority then held that sexual assault was not "related to" employment:

> Despite the fact that the sexual assaults may not have happened but for plaintiffs' employment with the Morse firm, we conclude that claims of sexual assault cannot be related to employment. The fact that the sexual assaults would not have occurred but for Lichon's and Smits's employment with the Morse firm does not provide a sufficient nexus between the terms of the MDRPA and the sexual assaults allegedly perpetrated by Morse. To be clear, Lichon's and Smits's claims of sexual assault are unrelated to their positions as, respectively, a receptionist and paralegal. Furthermore, under no circumstances could sexual assault be a foreseeable consequence of employment in a law firm. Accordingly, the circuit courts erroneously granted defendants' motions to dismiss these actions and compel arbitration of plaintiffs' claims. Both Lichon and Smits shall be permitted to litigate their claims in the courts of this state because the claims fall outside the purview of the MDRPA. [*Id*. at 393-394.]

The majority agreed with plaintiffs that because sexual assault at the hands of an employer or supervisor cannot be related to employment and because the MDRPA limits the scope of arbitration to claims that are "related to" employment, the MDRPA is inapplicable. The majority did not reach plaintiffs' argument that the MDRPA is unconscionable or illusory or their argument that Morse could not enforce the MDRPA as a nonsignatory.

The Court of Appeals dissent reasoned that plaintiffs' claims "arguably" fell within the language of the MDRPA. *Id*. at 400 (O'BRIEN J., dissenting). The dissent agreed that sexual assault is not related to employment, but thought the dispositive question was broader. Rather than focusing on the language of the MDRPA limiting its scope to matters "relative to your employment," the dissent looked to other language in the agreement stating that the parties agreed to arbitrate " 'any claim against another employee of the Firm

8

for violation of the Firm's Policies, discriminatory conduct or violation of other state or federal employment or labor laws.' " *Id.* at 403. Thus, the dissent concluded, plaintiffs had "agreed to arbitrate 'any claim against another employee of the Firm for . . . discriminatory conduct.' " *Id.*

Defendants sought leave to appeal here, and we granted leave to appeal, ordering the parties to address generally whether the claims set forth in the plaintiffs' complaints are subject to arbitration. *Lichon v Morse*, 504 Mich 962 (2019).

## II. STANDARD OF REVIEW

This Court reviews de novo circuit court decisions on motions for summary disposition brought under MCR 2.116(C)(7). *Altobelli v Hartmann*, 499 Mich 284, 294-295; 884 NW2d 537 (2016). Under MCR 2.116(C)(7), summary disposition is appropriate when claims are subject to "an agreement to arbitrate or to litigate in a different forum." "Whether a particular issue is subject to arbitration is also reviewed de novo, as is the interpretation of contractual language." *Id.* at 295 (citations omitted).

## III. ANALYSIS

The Court of Appeals majority's analysis started from the proposition that "[t]he sole issue for us to decide is whether the MDRPA encompasses the subject matter of the dispute at issue in this case." *Lichon*, 327 Mich App at 392 (quotation marks and citation omitted). The MDRPA expressly limits its application to matters "relative to . . . employment." So, whether the MDRPA encompasses the subject matter of the dispute turns on whether the claims are relative to employment. The MDRPA is not alone in limiting its scope to matters which are "relative to employment" or "related to

9

employment," and other courts have put considerable thought into whether various claims are relative to employment. Generally, we think this question can be resolved by asking whether the claim can be maintained without implicating the employment relationship.

## A. PRINCIPLES OF CONTRACTUAL INTERPRETATION

Because "[a]rbitration is a matter of contract," *Kaleva-Norman-Dickson Sch Dist No. 6 v Kaleva-Norman-Dickson Sch Teachers' Assoc*, 393 Mich 583, 587; 227 NW2d 500 (1975), "when interpreting an arbitration agreement, we apply the same legal principles that govern contract interpretation," *Altobelli*, 499 Mich at 295. Our goal in interpreting a contract is to "ascertain the intent of the parties at the time they entered into the agreement." *Id*.

Here, the question is whether plaintiffs' claims are governed by the MDRPA. This threshold question of whether a dispute is subject to arbitration is for a court to determine. *Kaleva*, 393 Mich at 591. As we have said, "[a] party cannot be required to arbitrate an issue which [it] has not agreed to submit to arbitration." *Id*. at 587.

As a general matter, Michigan's public policy favors arbitration. *Altobelli*, 499 Mich at 295. But this general position favoring arbitration does not go so far as to override foundational principles of contractual interpretation. In *Kaleva*, in the context of collective bargaining agreements, we held that it was appropriate to apply United States Supreme Court precedent regarding the National Labor Relations Act (NLRA), 29 USC 151 *et seq*., to contracts entered into under the state's public employment relations act (PERA), MCL 423.201 *et seq*. *Kaleva*, 393 Mich at 590-591. That holding seems to have expanded in application in the lower courts beyond collective bargaining agreements to a more general

10

rule that parties are bound to arbitration if the disputed issue is "arguably" within the arbitration clause. See, e.g., *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 163; 742 NW2d 409 (2007); *Fromm v MEEMIC Ins Co*, 264 Mich App 302, 305-306; 690 NW2d 528 (2004). This is not a rule we have adopted outside of the context of collective bargaining agreements, and we decline to do so now. Our general practice of looking to federal precedent discussing the NLRA to interpret the PERA is simply inapplicable here because the PERA is not at issue. In no way does this signal a judicial hostility to arbitration; rather, we simply recognize that agreements to arbitrate should be read like any other contract. *Altobelli*, 499 Mich at 295.

## B. WHETHER THESE CLAIMS ARE COVERED BY THE MDRPA

To answer whether the MDRPA governs plaintiffs' claims in these cases, we look first to the words of the agreement. The MDRPA applies to "all concerns you have over the application or interpretation of the Firm's Policies and Procedures relative to your employment." Thus, the MDRPA limits its scope from the outset to matters "relative to . . . employment."[2]

---

[2] The dissent asserts that our analysis fails to give consideration to the complete sentence—i.e., that we have "lop[ped] off" the first part of the phrase, "all concerns you have over the application or interpretation of the Firm's Policies and Procedures," in order to "isolate the second half, 'relative to your employment.' " We disagree. Our analysis gives effect to every part of the sentence. Under the MDRPA, plaintiffs must have "concerns;" they indisputably do. Those concerns must be over the application or interpretation of the Morse firm's policies and procedures; plaintiffs' concerns meet this requirement because, as the dissent points out, the firm's policies and procedures proscribe unwanted sexual contact, harassment, and abuse. Next, those concerns must be "relative to . . . employment." This is the disputed issue. To be arbitrable, the concerns must *both* involve the application or interpretation of the Morse firm's policies and procedures *and* be relative to employment. Either fact, standing alone, is insufficient. It is the dissent that "lops off" the phrase

Defendants accurately recite facts supporting connections between plaintiffs' claims and their employment. For example, the alleged assaults took place at work or at work-related functions, and Morse held a position of power over the plaintiffs. But not every factual connection between a plaintiff's claim and her job makes the claim relative to or related to employment—those facts need to be evaluated under a standard that distinguishes claims "relative to" employment from claims not "relative to" employment. As the United States Court of Appeals for the Eleventh Circuit observed, in evaluating what it means for a claim to be "related to" employment:

> "[R]elated to" marks a boundary by indicating some direct relationship; otherwise, the term would stretch to the horizon and beyond. As the Supreme Court has explained in the [Employment Retirement Income Security Act, 29 USC 1001 *et seq*.,] pre-emption context, "related to" is limiting language and "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy," it would have no limiting purpose because "really, universally, relations stop nowhere." *NY State Conference of Blue Cross & Blue Shield Plans v Travelers Ins Co*, 514 US 645, 655; 115 S Ct 1671, 1677; 131 L Ed 2d 695 (1995) (quotation marks omitted). [*Doe v Princess Cruise Lines, Ltd*, 657 F3d 1204, 1218-1219 (CA 11, 2011).]

The same principle applies here. If litigating parties have an employment or other contractual relationship, one party will likely be able to find some factual connection, however remote, between their dispute and the relationship. But we require more than the

---

"relative to . . . employment," choosing instead to read the limitation as only excluding "an employee's concerns about how the policies or procedures were interpreted or applied to another employee or how they were interpreted or applied in general, unrelated to any particular employee." Perhaps if the modifying phrase was "relative to you," rather than "relative to your employment," this would be a reasonable interpretation. Still, it would be an odd construction given that it is unclear how one employee might seek to arbitrate the concerns of another employee, or to arbitrate the meaning of the firm's policies in the abstract. But this is not the phrase we are asked to interpret.

barest factual connection for a claim to be relative to employment or another pertinent contractual relationship.

In determining whether a claim is relative to employment, we adopt the approach of a number of other jurisdictions that "ask if [the] action could be maintained without reference to the contract or relationship at issue." *Academy of Med of Cincinnati v Aetna Health, Inc*, 108 Ohio St 3d 185, 186; 842 NE2d 488 (Ohio 2006), citing *Fazio v Lehman Bros, Inc*, 340 F3d 386 (CA 6, 2003). Accord *Jones v Halliburton*, 583 F3d 228 (CA 5, 2009); *Doe*, 657 F3d at 1219-1220; *United States v My Left Foot Children's Therapy, LLC*, 871 F3d 791, 799 (CA 9, 2017). This analysis "functions as a tool to determine a key question of arbitrability—whether the parties agreed to arbitrate the question at issue." *Academy of Med of Cincinnati*, 108 Ohio St 3d at 191. Such an analysis "prevents the absurdity of an arbitration clause barring a party to the agreement from litigating *any* matter against the other party, regardless of how unrelated to the subject of the agreement," and ensures that the mere "existence of a contract between the parties does not mean that every dispute between the parties is arbitrable." *Id*.[3]

The Eleventh Circuit applied this test in *Doe*. In that case, the plaintiff worked on a cruise ship as a bar server. *Doe*, 657 F3d at 1208. Her employment agreement contained an arbitration provision. *Id*. at 1214-1215. It stated, in part, that she agreed to arbitrate

---

[3] We agree with the dissent that " '[r]elative' means 'a thing having a relation to or connection with or necessary dependence on another thing.' " (Citation omitted.) However, that circular observation is not very helpful given that "really, universally, relations stop nowhere." *NY State Conference of Blue Cross & Blue Shield Plans*, 514 US at 655 (quotation marks and citation omitted). We disagree with the dissent that its reading of the phrase is "more concrete."

" 'any and all disputes . . . [or] claims . . . relating to or in any way arising out of or connected with the Crew Agreement.' " *Id*. (emphasis omitted). A "dispute" arose when the plaintiff was drugged and raped by coworkers. *Id*. at 1209. When she reported the rape to her supervisors, they didn't let her seek medical treatment and forced her to continue working and to submit to repeated questioning. *Id*. at 1209-1210. She was eventually provided some treatment on the ship, but she was not permitted to leave the ship to seek further necessary treatment until three weeks after the assault. *Id*. Ultimately, the plaintiff's blood and rape kit samples as well as her medical records were incinerated. *Id*. at 1210.

The plaintiff sued Princess Cruise Lines, asserting ten claims. The first five claims arose from her status as a "seaman,"[4] while the other claims were common-law tort claims.[5]

---

[4] These claims were:

> (1) a "Jones Act negligence" claim, alleging that Princess Cruise Lines breached its "duty to provide a safe place to work such that [Doe] could perform the job obligations in a reasonably safe manner and live aboard the vessel free from sexual violence and/or sexual harassment"; (2) an unseaworthiness claim, alleging that the cruise line breached its "non-delegable duty to provide [Doe] with a seaworthy vessel upon which to work and live free from sexual battery and/or sexual harassment"; (3) a Jones Act claim, alleging that the cruise line breached its duty under that act to provide Doe with prompt, adequate, and complete medical treatment for "injuries sustained while in the service of the vessel"; (4) a maintenance and cure claim, alleging that the cruise line "purposefully refused to arrange for and pay [for] timely and complete medical cure" despite its obligation to do so under "the General Maritime Law"; and (5) a Seaman's Wage Act claim that the cruise line breached its "duty to timely pay all of [Doe's] wages as a seaman." [*Doe*, 657 F3d at 1211-1212 (alterations in original).]

[5] These claims were:

14

The defendant sought to compel arbitration on the entire complaint, and the district court denied the motion in its entirety. *Id*. at 1212. The defendant appealed, arguing that all the claims arose out of or were connected to the plaintiff's employment and, as a result, were subject to arbitration. *Id*. at 1213. The appellate court held that some of the claims were subject to arbitration, and some were not. *Id*. at 1219.

The court concluded that the five common-law tort claims were not subject to arbitration because they did not depend on the employment relationship. *Id*. Those claims were based on allegations that, *inter alia*, the officers of the cruise ship had not allowed the plaintiff to go ashore for medical treatment, the evidence of the rape had been destroyed, and, of course, that the plaintiff was drugged and raped. *Id*. The court noted that none of those allegations had anything to do with the plaintiff's employment agreement or her work duties. *Id*. Further, "[t]he cruise line could have engaged in that tortious conduct even in the absence of any contractual or employment relationship with [the plaintiff]," so those

_____

(6) a false imprisonment claim, alleging that the cruise line had "purposefully and intentionally restrained [Doe] against her will on the cruise ship and did not permit her to leave the cruise ship to go ashore for medical treatment" in Seattle; (7) an intentional infliction of emotional distress claim, alleging "separate and independent torts committed by" the cruise line, its agents, and its employees related to Doe's rape and the way that they handled the situation and treated her after learning of the rape; (8) a spoliation of evidence claim, alleging that the cruise line breached its duty to preserve evidence after one of its crew members sexually assaulted and battered Doe; (9) an invasion of privacy claim, alleging that the cruise line, th[r]ough its agents, breached its duty to protect Doe's confidentiality and privacy as a rape victim by repeatedly disclosing her real name in an effort to intimidate and embarrass her; and (10) a fraudulent misrepresentation claim, alleging that officers of the cruise line who were on the ship repeatedly and falsely told Doe after she had been drugged and raped that she could not disembark the ship to get medical treatment and counseling by doctors of her own choosing. [*Id*. at 1212 (first alteration in original).]

15

claims were not "an immediate, foreseeable result of the performance of the parties' contractual duties." *Id*. (quotation marks and citation omitted). The fact that the plaintiff would likely not have been on the ship but for her employment did not mean that all her claims arose from her employment. *Id*. The court illustrated the point by noting that if a passenger on the ship had been subjected to the same treatment as the plaintiff, he or she could have brought the same claims. *Id*. at 1220.

By contrast, the court concluded that the plaintiff's other claims were subject to arbitration because they depended on the employment relationship. Two of those claims were based specifically on the Jones Act, 46 USC 30104, and alleged that the defendant had breached statutory duties owed to the plaintiff. *Id*. But the defendant owed those duties to the plaintiff only because of her status as a seaman. *Id*. Another claim subject to arbitration was based on an assertion of "unseaworthiness," which also depended on the plaintiff's status as a seaman. *Id*. A fourth claim subject to arbitration asked for "maintenance and cure," which is a maritime law remedy available to seamen. *Id*. at 1221. The final claim subject to arbitration was brought under the Seaman's Wage Act, 46 USC 10313, and also depended on the plaintiff's status as a seaman. *Id*. None of these claims could have been brought if not for the employment relationship. *Id*. at 1220-1221.

Like the plaintiff in *Doe*, plaintiffs here have brought several claims. Whether the claims are subject to arbitration depends on whether they are covered by the MDRPA, which, in turn, depends on whether the claims are relative to plaintiffs' employment. We hold that a court answers that question by considering whether the claims could be maintained without reference to the contract or relationship at issue. To borrow the illustration from *Doe*, if Morse had groped or propositioned opposing counsel or a client

16

while at the Morse firm's office, or if Morse had grabbed the breasts of a server or other patron of the restaurant during the firm's Christmas party, could those individuals bring the same claims as plaintiffs?

Neither the Court of Appeals nor the circuit courts considered this standard when evaluating defendants' motions to compel arbitration. Rather than apply this standard in the first instance, we vacate the decision of the Court of Appeals and remand these matters to the circuit courts. Further, just as the lower courts did not have the benefit of this framing when evaluating defendants' motions, neither did plaintiffs have the benefit of this framing when formulating their complaints. In this regard, we remind the circuit courts that, under MCR 2.118(A)(2), "[l]eave [to amend pleadings] shall be freely given when justice so requires."

Defendants argue that the claims do not need to be relative to employment to be covered by the MDRPA, because they are otherwise expressly covered by the MDRPA given that it applies to "any claim against another employee of the Firm for violation of the Firm's Policies" and because the firm's policies prohibit sexual harassment, including physical contact. The dissent also focuses on this language. As a textual matter, we do not read the language relied on by the dissent and defendants as additional words of inclusion covering matters beyond those relative to employment. Rather, this language merely specifies some matters relative to employment which are included. The paragraph reads, in full:

> This Mandatory Dispute Resolution Procedure shall apply to all concerns you have over the application or interpretation of the Firm's Policies and Procedures relative to your employment, including, but not limited to, any disagreements regarding discipline, termination, discrimination or violation of other state or federal employment or labor

17

laws. This includes any claim over the denial of hire. This Procedure includes any claim against another employee of the Firm for violation of the Firm's Policies, discriminatory conduct or violation of other state or federal employment or labor laws. Similarly, should the Firm have any claims against you arising out of the employment relationship, the Firm also agrees to submit them to final and binding arbitration pursuant to this Procedure.

The first sentence clearly limits the scope of the MDRPA to matters "relative to . . . employment." The next two sentences begin, "[t]his includes" and "[t]his Procedure includes." But the procedure is limited to matters "relative to . . . employment." These sentences specify some matters "relative to employment" that are covered. Finally, the Morse firm's reciprocal obligation in the last sentence contains the same limitation, defining the firm's obligation to arbitrate as limited to claims "arising out of the employment relationship . . . ." Read in context, the MDRPA clearly limits its scope to matters relative to employment.[6]

In light of this resolution, we do not reach plaintiffs' argument that the MDRPA is unconscionable or illusory, nor do we address plaintiffs' argument that Morse could not enforce the MDRPA because he did not sign it. The circuit court in Smits's case had

---

[6] The argument advanced by defendants and the dissent in this regard also wades into the territory of "the absurdity of an arbitration clause barring a party to the agreement from litigating *any* matter against the other party, regardless of how unrelated to the subject of the agreement." *Academy of Med of Cincinnati*, 108 Ohio St 3d at 191. Taking this argument to its logical conclusion, plaintiffs would be bound to arbitrate *any* sexual assault Morse might inflict on them because sexual assault is prohibited by the firm's policies. One wonders, under this interpretation, could defendants compel arbitration of *any* claim merely by proscribing such conduct in its policy manual? Could a plaintiff be compelled to arbitrate a wrongful death claim merely because defendants' policy manual stated, "We do not tolerate intentional or negligent killing at the Firm"? Though we do not reach plaintiffs' argument that the MDRPA is unconscionable, plaintiffs would seem to be in a much stronger position with regard to that argument if their employment agreement bound them to arbitrate concerns unrelated to their employment.

18

considered whether her claims were barred by the contractual-limitations period in the employee manual. Like the MDRPA, that period applies only to matters "relating to . . . employment," so its scope is similarly limited. Therefore, on remand, the circuit court should consider whether the contractual-limitations period applies only to claims arbitrable under the MDRPA.

## IV. CONCLUSION

We vacate the judgment of the Court of Appeals and remand these cases to their respective circuit courts where the courts may analyze defendants' motions to compel arbitration by analyzing which of plaintiffs' claims can be maintained without reference to the contract or relationship at issue. Plaintiffs may seek to amend their complaints in light of this new direction.

                        Megan K. Cavanagh
                        Bridget M. McCormack
                        Richard H. Bernstein
                        Elizabeth T. Clement

# STATE OF MICHIGAN

## SUPREME COURT

SAMANTHA LICHON,

      Plaintiff-Appellee,

v                                                                                        No. 159492

MICHAEL MORSE and MICHAEL J.
MORSE, PC,

      Defendants-Appellants.

_____

JORDAN SMITS,

      Plaintiff-Appellee,

v                                                                                        No. 159493

MICHAEL MORSE and MICHAEL J.
MORSE, PC,

      Defendants-Appellants.

_____

VIVIANO, J. (*dissenting*).

The task before the Court in these cases is a common one. We must interpret contractual language to determine the parties' intent; specifically, we must determine whether the parties meant to assign plaintiffs' present claims to arbitration. Instead of examining the relevant text and context, the majority plucks a standard from out-of-state caselaw and imposes it upon the parties here. A proper interpretation of the contract's language shows that plaintiffs' claims against defendant Michael J. Morse, PC, doing

business as the Mike Morse Law Firm (the Firm) are arbitrable under the contract. I would therefore reverse the Court of Appeals' decision to the contrary. The claims against defendant Michael Morse individually are also arbitrable under the contract if he can invoke the arbitration clause. Because the Court of Appeals below did not determine whether Morse has the authority to enforce the agreement, which he did not sign, I would remand on that issue.

Arbitration agreements are contracts, and so "when interpreting an arbitration agreement, we apply the same legal principles that govern contract interpretation." *Altobelli v Hartmann*, 499 Mich 284, 295; 884 NW2d 537 (2016). Accordingly, the Court's "task is to ascertain the intent of the parties at the time they entered into the agreement, which [is] determine[d] by examining the language of the agreement according to its plain and ordinary meaning." *Id*. This requires reading individual clauses in light of the contract as a whole, "since a contract should be construed so as to give full meaning and effect to all its provisions." 21 Williston, Contracts (4th ed), § 57:20, p 220. Although we have indicated that public policy supports arbitration, the contract here is clear and therefore any policy favoring arbitration does not inform my interpretation. See *Altobelli*, 499 Mich at 295.[1]

---

[1] I agree with the majority to the extent it limits the application of the principle that a party is bound to arbitration if the dispute is "arguably" within the arbitration clause. See *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 163; 742 NW2d 409 (2007). The policy in support of arbitration flows from statutes permitting parties to arbitrate. See *Detroit v AW Kutsche & Co*, 309 Mich 700, 703; 16 NW2d 128 (1944). But such legislation simply compels courts to "place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT&T Mobility LLC v Concepcion*, 563 US 333, 339; 131 S Ct 1740; 179 L Ed 2d 742 (2011). Consequently,

2

While the majority frames the question of arbitration as depending on whether the plaintiffs' claims are "related to employment," that is not how the contract puts it:

> This Mandatory Dispute Resolution Procedure shall apply to *all concerns you have over the application or interpretation of the Firm's* Policies and Procedures relative to your employment, including, but not limited to, any disagreements regarding discipline, termination, discrimination or violation of other state or federal employment or labor laws. This includes any claim over the denial of hire. This Procedure includes any claim against another employee of the Firm for violation of the Firm's Policies, discriminatory conduct or violation of other state or federal employment or labor laws. Similarly, should the Firm have any claims against you arising out of the employment relationship, the Firm also agrees to submit them to final and binding arbitration pursuant to this Procedure. [Emphasis added.][2]

The general scope of arbitrability is established at the outset: the arbitration agreement "shall apply to *all concerns you have over . . . the Firm's* Policies and Procedures relative to your employment . . . ." Following this are specific examples of arbitrable disputes falling within the agreement as well as the Firm's commitment to arbitrate "any claims" against its employees "arising out of the employment relationship . . . ."

The issue is whether this language covers plaintiffs' present claims, making them arbitrable. As an initial matter, the agreement specifically includes "disagreements" regarding the violation of state employment laws. Both plaintiffs here have alleged violations of the Elliott-Larsen Civil Rights Act, MCL 37.2101 to MCL 37.2804. We have interpreted that statute to prohibit sexual assaults that create a hostile work environment.

---

this pro-arbitration policy should not mislead courts into distorting a contract's ordinary meaning in an effort to render it applicable to the dispute at issue.

[2] A second paragraph in the agreement details specific exclusions to arbitration that are not at issue here.

3

See *Radtke v Everett*, 442 Mich 368, 394-395; 501 NW2d 155 (1993). Plaintiffs here have alleged that they were sexually assaulted in a manner that affected their work. Those claims, therefore, fit within the arbitration agreement.

To be arbitrable, the rest of the claims—all based on the common law—would need to involve "concerns . . . over the application or interpretation of the Firm's Policies and Procedures relative to your employment."[3] In other words, if an employee has a "concern" about how the Firm's policies were applied to him or her, that concern goes to arbitration. A "concern" is relevantly defined as a "matter for consideration." Merriam-Webster.com Dictionary, *Concern* <https://www.merriam-webster.com/dictionary/concern> (accessed April 22, 2021) [https://perma.cc/2J7R-77US]. As used in the agreement, "concerns" encompasses various "claims," such as those arising from "the denial of hire" or those lodged against another employee. But nothing limits the key sentence here—regarding concerns about the policies and procedures—to any particular type of legal cause of action, such that a tort claim for sexual assault or intentional infliction of emotional distress would be excluded from the agreement. If the claim involves the "concern," it must be arbitrated. This conclusion flows from the language of the contract and also is consistent with the view of other courts that determining whether a claim is arbitrable depends on the underlying facts rather than the particular legal cause presented. See, e.g., *Gregory v Electro-Mechanical Corp*, 83 F3d 382, 384 (CA 11, 1996) ("Whether a claim falls within

---

[3] Against both defendants, plaintiffs assert claims of negligent and intentional infliction of emotional distress and negligence, gross negligence, and wanton and willful misconduct. Against Morse, in his individual capacity, plaintiffs also assert a claim of sexual assault.

4

the scope of an arbitration agreement turns on the factual allegations in the complaint rather than the legal causes of action asserted.").[4]

Next, the "concerns" must involve the "application or interpretation of the Firm's Policies and Procedures relative to your employment." The majority lops off the critical first part of this phrase so that it can isolate the second half, "relative to your employment." And in analyzing the latter phrase, the majority makes no pretense of applying normal interpretive methods but instead reaches for out-of-state caselaw that similarly fails to offer much in the way of textual interpretation.[5] Even so, the majority may have come close to

---

[4] See also *Doe v Hallmark Partners, LP*, 227 So 3d 1052, 1056 (Miss, 2017) ("To answer whether [the plaintiff] agreed to arbitrate her assault- and rape-based tort claims, this Court must 'focus on factual allegations in the complaint rather than the legal causes of action asserted.' ") (citation omitted); 21 Williston, Contracts (4th ed), § 57:21, p 231 ("In ascertaining whether a particular claim falls within the scope of an arbitration agreement, the court should focus on the factual allegations in the complaint rather than the legal causes of action asserted; if the allegations underlying the claim touch matters covered by the arbitration agreement, then the claim must be arbitrated, whatever legal labels are attached to it.").

[5] For instance, in *Doe v Princess Cruise Lines, Ltd*, the court appears to have adopted the gist of its interpretation not from an examination of the ordinary meaning of the arbitration clause at issue but rather from caselaw discussing the need to place limits on the term "related to" as it appeared in a federal retirement statute. *Doe v Princess Cruise Lines, Ltd*, 657 F3d 1204, 1218-1219 (CA 11, 2011), citing *NY State Conference of Blue Cross & Blue Shield Plans v Travelers Ins Co*, 514 US 645, 655; 115 S Ct 1671; 131 L Ed 2d 695 (1995). The Ohio case the majority relies on simply cited a case from the United States Court of Appeals for the Sixth Circuit for the same standard, calling it a "test" without suggesting that it reflected the meaning of the contractual language. *Academy of Med of Cincinnati v Aetna Health, Inc*, 108 Ohio St 3d 185, 186, 190-191; 842 NE2d 488 (Ohio, 2006), citing *Fazio v Lehman Bros, Inc*, 340 F3d 386 (CA 6, 2003). *Fazio*, in turn, took the test from a decision of the United States Court of Appeals for the Fifth Circuit, again failing to ask whether the test accurately captured the meaning of the contract's text. See *Fazio*, 340 F3d at 395, citing *Ford v NYLCare Health Plans of the Gulf Coast, Inc*, 141 F3d 243, 250-251 (CA 5, 1998). Finally, in *Ford*, the Fifth Circuit applied Texas law, and its decision, like

5

capturing the ordinary meaning of "relative to your employment," to the extent that the majority holds that this phrase requires asking whether the claim "can be maintained without reference" to the plaintiff's employment. In the present context, "relative" means "a thing having a relation to or connection with or necessary dependence on another thing." Merriam-Webster.com Dictionary, *Relative* <https://www.merriam-webster.com/dictionary/relative> (accessed April 22, 2021) [https://perma.cc/7C5S-B3BP]. Thus, if a "concern" must be "relative" to "employment," the concern must have some connection to employment. And so if the concern can be made "without reference" to employment, perhaps we could conclude that the concern is not "relative to . . . employment."[6]

---

the other decisions, did not describe how the formulation of the test is the proper product of contract interpretation.

[6] It is noteworthy, however, that courts frequently characterize arbitration clauses using this basic phrase, i.e., "relating to," as "broad." See, e.g., *Hallmark Partners*, 227 So 3d at 1056 ("Narrow arbitration language governs disputes that 'arise out of' the contract, while broad clauses cover disputes that 'relate to' or 'are connected with' the contract."). But the majority's failure to apply its new standard in this case—something we often do in cases that develop a new standard—leaves doubt about how broad or narrow the standard is. From the majority's examples, the standard would seem to severely limit the scope of arbitrable disputes. The majority asks whether a client of the Firm or a server at a restaurant could bring the same sexual-assault claims as the plaintiffs in these circumstances. If so, then the claims do not relate to employment. The answer clearly appears to be that those individuals could bring the same claims. Thus, the result of the majority's hypotheticals is that only those disputes arising from a core aspect of the employment relationship, such as a dispute over the terms of the employment agreement, must be arbitrated. But if the parties wanted to accomplish this, they could have used the language they included later in the agreement under which the Firm agreed to arbitrate "any claims" against its employees "arising out of the employment relationship . . . ." That language has been construed as narrower than the type of language at issue here involving disputes that "relate to" employment. See, e.g., *United States ex rel Welch v My Left Foot Children's Therapy, LLC*, 871 F3d 791, 798 (CA 9, 2017) ("As we have held, the words arising out of are

---

But the arbitration agreement's scope is not defined by the "concerns" that are "relative to . . . employment." Instead, the arbitrable "concerns" involve "the application or interpretation of the Firm's Policies and Procedures relative to your employment . . . ." Accordingly, a "concern" that must go to arbitration is one that regards how the policies and procedures were applied or interpreted "relative to [a plaintiff's] employment." From this perspective, the phrase "relative to [a plaintiff's] employment" simply excludes from the scope of arbitration a plaintiff's concerns with the interpretation or application of the policies and procedures that are not related to that plaintiff. This would exclude an employee's concerns about how the policies or procedures were interpreted or applied to another employee or how they were interpreted or applied in general, unrelated to any particular employee.[7]

Under the proper interpretation of the contract, then, the arbitrability of plaintiffs' common-law claims turns upon whether the Firm's policies and procedures cover the

---

'relatively narrow as arbitration clauses go' . . . . [T]he phrase 'relate to' is broader than the phrases "arising out of" or 'arising under' . . . .") (citations omitted); *Hallmark Partners*, 227 So 3d at 1056 ("Narrow arbitration language governs disputes that 'arise out of' the contract, while broad clauses cover disputes that 'relate to' or 'are connected with' the contract.").

[7] The majority elides the agreement's reference to "the Firm's Policies and Procedures" by dividing the relevant contractual language into three parts: "[1] all concerns you have [2] over the application or interpretation of the Firm's Policies and Procedures [3] relative to your employment . . . ." The first two requirements are satisfied, according to the majority, and only the third remains to be decided on remand, i.e., whether the concerns were relative to plaintiffs' employment. But the third part cannot be construed to simply relate back to "concerns" irrespective of the Firm's policies and procedures, as the majority suggests. The "concerns" themselves are about how the Firm's policies and procedures were applied "relative to [plaintiffs'] employment . . . ." Only by artificially separating the policies-and-procedures language can the majority create its freestanding "relative to your employment" requirement.

7

alleged conduct (sexual assault and harassment) and whether plaintiffs' allegations concern the application or interpretation of those policies or procedures. Therefore, the application of the contract to this case requires an examination of the policies and procedures, which contain much that encompasses the factual allegations here. The Employee Policy Manual specifically proscribes sexual harassment, which it defines as "unwelcome or unwanted conduct of a sexual nature (verbal, written, physical or environment[al]) when" either (1) the "[s]ubmission to or rejection of this conduct is used as a factor in decisions affecting hiring, evaluation, promotion or other aspects of employment," or (2) the "[c]onduct substantially interferes with an individual's employment or creates an intimidating, hostile or offensive work environment." "This policy covers all employees," the manual continues, and "[t]he Firm will not tolerate, condone or allow any incident of discrimination, harassment or retaliation. The Firm encourages reporting of all such incidents, regardless of who the offender may be." If the employee cannot confront the harasser, he or she "must report any perceived discrimination, harassment, or retaliation to their [sic] supervisor or Human Resources." An investigation will follow and "[p]rompt corrective action will be taken," including by disciplining or firing the offender.

Another portion of the manual establishes standards of conduct, the breach of which can lead to discipline. Included among these are "[s]exual or other unlawful or unwelcome harassment." The Firm also "strongly discourage[s]" dating between employees and prohibits an employee from dating a supervisor—if a relationship with a supervisor occurs, one of the employees is subject to transfer or termination. In yet another section, the manual states that coworkers must be treated "with courtesy and respect at all times." Further, "[t]he Firm does not allow behavior in the workplace at any time that threatens,

8

intimidates, bullies, or coerces another employee" or that harasses another employee on the basis of sex. This prohibition extends to any proscribed acts "that might occur on our premises at any time, at work-related functions, or outside work if it affects the workplace." Again, violations are to be reported, with investigations and discipline to follow. The manual puts the Firm's Compliance Officer in charge of investigating and resolving all complaints alleging that a policy has been violated.

In sum, the manual specifically proscribes unwanted sexual contact and a great deal of behavior that might surround that contact, such as verbal harassment or an abusive work environment. The manual also establishes a general requirement of respect for coworkers, and it puts in place a procedure for complaints concerning violations of the Firm's policies.

The question is whether plaintiffs' allegations involve concerns with how the Firm's policies were interpreted or applied to them. I believe that the facts laid out in the complaint meet this requirement. Both plaintiffs allege that Morse engaged in behavior that would directly violate the manual. Plaintiff Samantha Lichon contends that Morse sexually harassed her at work, both verbally and physically. "At all relevant times," her complaint states, she was an employee of Morse and the Firm. Also "[a]t all relevant times," Morse was an agent of the Firm and was "acting within the course and scope of his employment." She further states that she made multiple reports of this behavior to her superiors and to the human resources department, but that no action was taken and the harassment continued. This conduct created an intimidating and hostile work environment that "substantially interfered with [her] employment."

With regard to her claims against the Firm for negligent and intentional infliction of emotional distress, Lichon alleges that the Firm failed to remedy the situation after her

9

formal complaints, failed to supervise Morse, failed to maintain safe premises, failed to have safeguards against sexual assaults, failed to provide a safe work environment, and assisted Morse in seeking to cover up the assault. The last contention refers to Lichon's allegation that, a few months after she was fired, an employee of the Firm intimidated her in an attempt to dissuade her from filing suit against defendants. This gives rise to her claim of civil conspiracy against defendants for trying to prevent her lawsuit.

At the core of all the legal claims are Lichon's allegations of sexual harassment and the Firm's related failure to abide by its policies and procedures. She contends, in essence, that Morse engaged in conduct violating the Firm's policies and that the Firm failed to redress these violations in accordance with the manual. The claims thus represent Lichon's concerns with how the Firm's policies and procedures were interpreted or applied relative to her employment. The claims therefore fall within the substantive scope of the arbitration clause.

The analysis is the same for plaintiff Jordan Smits's allegations. Both of her complaints concern events that occurred at the Firm's 2015 Christmas party. Smits contends that Morse sexually assaulted her in front of other employees by grabbing her breasts at that employee-only party. Smits claims to have reported the assault to the Firm's human resources department, which did nothing in response. After resigning and refusing to sign a nondisclosure agreement, Smits says she received a call from an employee of the Firm warning her that Morse "could make it difficult" for Smits "to get a job." She further states that the Firm was aware of Morse's similar behavior with other female employees and therefore knew of his propensity for such acts. The Firm also failed to remedy the

10

situation, properly supervise Morse, provide a safe workplace, and conduct company events in a safe manner.

As with Lichon, all of Smits's legal claims surround the assault, the lack of response to Smits's internal complaints concerning the assault, and the attempted cover-up. Like Lichon's allegations, Smits's factual contentions similarly represent her concerns regarding how the Firm's policies and procedures were interpreted or applied relative to her employment. Therefore, like Lichon's claims, Smits's claims are within the substantive scope of the arbitration clause.

This analysis suffices to determine that the claims are arbitrable under the contract. The Firm, as a signatory of the agreement, can therefore seek to compel arbitration pursuant to the contract. But Morse, in his individual capacity, did not sign the agreement. Thus, the next question is whether he can invoke the agreement. Because this was not decided below, I would remand the case to determine whether Morse can compel arbitration despite being a nonsignatory.[8] If Morse has such authority, then under the analysis above, the

[8] It is possible that the plain language of the arbitration clause covers these claims against Morse. It states, "This Procedure [i.e., the arbitration clause] includes any claim against another employee of the Firm for violation of the Firm's Policies, discriminatory conduct or violation of other state or federal employment or labor laws." But interpreting the arbitration clause to cover the claims against Morse would require a finding that Morse is an employee of the Firm. As the Court of Appeals majority noted below, the Firm's regulatory filings show that "Morse is the president, secretary, treasurer, director, and sole shareholder of the Morse firm." *Lichon v Morse*, 327 Mich App 375, 396; 933 NW2d 506 (2019). It is not clear, however, whether he would also be considered an employee for purposes of the arbitration clause. Alternatively, various courts have recognized that nonsignatories can enforce arbitration agreements in certain circumstances, such as "when the issues in dispute are intertwined with the agreement that the signatory signed, or if there is a close relationship between the entities involved and between the alleged wrongs and the contract . . . ." *Application of Equitable Estoppel to Compel Arbitration By or Against Nonsignatory—State Cases*, 22 ALR6th 387, 403, § 2; see also *GE Energy Power*

substance of the claims made against him falls within the contract, and those claims, like the claims against the Firm, are subject to arbitration.[9]

In reaching a different conclusion, the majority upends the parties' allocation of certain disputes to arbitration and others to litigation. The parties specified the range of arbitrable subjects by linking arbitration to the matters contained in the Firm's policies and procedures. This made the scope of arbitration more concrete than it would be under the open-ended standard fashioned by the majority today. The application of the majority's standard will rely heavily on a court's belief about what "relates" to employment. The majority's failure to apply the standard here also yields no insights. Results will vary, and the stability the parties sought by invoking the policies and procedures will be lost.

In some cases, under this new standard, employees will be forced to litigate certain "concerns" they clearly intended to arbitrate—those involving a dispute about how a provision in the policies and procedures has been applied to him or her. If a court does not

---

*Conversion France SAS, Corp v Outokumpu Stainless USA, LLC*, 590 US ___, ___; 140 S Ct 1637, 1643-1644; 207 L Ed 2d 1 (2020) (recognizing "that arbitration agreements may be enforced by nonsignatories through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel") (cleaned up). Our Court of Appeals has similarly observed that whether nonsignatories can arbitrate depends on general common-law principles, such as agency law. See *American Federation of State, Co & Muni Employees, Council 25 v Wayne Co*, 292 Mich App 68, 81; 811 NW2d 4 (2011).

[9] Plaintiffs develop other arguments against enforcement of the arbitration agreement by the Firm or Morse, including that the agreement is unconscionable and illusory and that defendants forfeited their right to enforce arbitration. These arguments do not directly involve the interpretation of the agreement and were not addressed by the Court of Appeals below. My resolution of the interpretive issues before the Court here would leave plaintiffs free to raise these other arguments on remand.

believe that the concern truly relates to employment—despite the fact that the subject matter has been placed in the policies and procedures—then the dispute will be headed to court. Conversely, in other cases, a court might conclude that a dispute relates to employment even though the subject matter is not covered by the policies and procedures (and therefore does not fall within the ordinary meaning of the arbitration clause, as discussed above). The court will accordingly order arbitration of a dispute the parties wanted to litigate.

By disregarding the text, the majority has attempted to craft a standard rather than interpret a contract. The resulting analysis resembles common-law rulemaking that seeks to find or formulate what the court thinks is the best rule for the circumstances.[10] But our imperative is to enforce the agreement into which the parties freely entered. See *Rory v Continental Ins Co*, 473 Mich 457, 469; 703 NW2d 23 (2005). Because the majority opinion today departs from these foundational principles, I dissent.

David F. Viviano
Brian K. Zahra

WELCH, J., did not participate in the disposition of this case because the Court considered it before she assumed office.

---

[10] The majority also invites plaintiffs to amend their complaints and "remind[s]" the lower courts of the lenient standard for amendments. The question of arbitrability here depends on the factual allegations of the complaint and whether they fall within the arbitration clause. By encouraging plaintiffs to amend, the majority appears to implicitly agree with my conclusion that, as they stand now, the allegations in the complaints require arbitration. In any event, one is left to wonder why the majority is so confident that plaintiffs have at the ready an alternate set of facts to plead in avoidance of the arbitration clause. See *Miller v Chapman Contracting*, 477 Mich 102, 105; 730 NW2d 462 (2007) (noting that although leave to amend should be freely given, it should be denied if the amendment would be futile).